UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

WILLIE EDOM, JR.,

      Plaintiff,

v.                                                                    Case No: 8:20-cv-1624-KKM-AEP

CHAD CHRONISTER, *individually
and in his official capacity as Sheriff of
Hillsborough County*,

      Defendants.

_____/

## <u>ORDER</u>

Defendant Chad Chronister, acting in both his individual and official capacity as

Sheriff of Hillsborough County, moves to dismiss all Counts of Plaintiff Willie Edom's

Amended Complaint under Federal Rule of Civil Procedure 12(b)(6). (Doc. 16; Doc. 17.)

Upon review, the Court grants Chronister's motion to dismiss Counts I, III, IV, V, VII,

and VIII. These Counts are dismissed without prejudice. Counts I, III, and VII fail because

Edom did not exhaust administrative remedies prior to bringing Title VII and Florida Civil

Rights Act (FCRA) claims for race discrimination and disability discrimination. Counts

IV, V, and VIII fail because Edom has not alleged sufficient facts to support individual or

municipal liability under 42 U.S.C. § 1983. But finding that Edom plausibly states a claim for relief under Counts II and VI, the Court declines to dismiss these Counts.

## I.    BACKGROUND

Edom alleges the following in his Amended Complaint.[1] (Doc. 13.) From 1994 to 2017, Edom worked as a Deputy Sheriff with the Hillsborough County Sheriff's Office (HCSO). (*Id.* at ¶ 8.) The HCSO suffered from "systemic racism" from "as early as 1996 and continuing up through his constructive termination" in 2017. (*Id.* at ¶ 11.) For example, when he was first assigned to the "Street Crimes Squad," Edom (who is an African-American male) and other minority deputies "were not allowed to attend advancement courses," even though other white squad members attended two or more courses per year. (*Id.* at ¶¶ 8, 11.) Edom asked to participate in the advancement courses because they were required for promotion. (*Id.* at ¶ 11.) But Major Albert Perotti "told him not to worry about promotion because he was needed on the streets as a role model." (*Id.* at ¶ 12.)

In 1999, while on duty, Edom and another deputy stopped a car with a broken taillight. (*Id.* at ¶ 15.) The driver of the car "held a gun to" the other deputy's "stomach with [the] intent to shoot," but Edom saved the deputy's life and arrested the driver. (*Id.*)

---

[1] The Court recites the facts based on the allegations within the Amended Complaint (Doc. 13), which it must accept as true in ruling on a motion to dismiss. *See Linder v. Portocarrero*, 963 F.2d 332, 334 (11th Cir. 1992); *Quality Foods de Centro Am., S.A. v. Latin Am. Agribusiness Dev. Corp. S.A.*, 711 F.2d 989, 994 (11th Cir. 1983).

Soon thereafter, a police captain asked Edom to drop the charges against the driver as a "personal favor to him." (*Id.* at ¶¶ 15, 16.) Believing the request unethical and illegal, Edom refused. (*Id.*) In response, the HCSO demoted Edom to Desk Deputy for three years. (*Id.* at ¶ 17.) After personnel changes in the HCSO, Edom explained his demotion to the new police captain and was returned to patrol duty. (*Id.* at ¶ 18.)

Around 2001, Edom "notified Major Brown of several illegal and racist activities that other deputies performed," including "continually [stopping] black males simply because they were labeled 'suspicious persons.'" (*Id.* at ¶ 19.) "He saw other deputies illegally arrest black males for trespass without giving them a warning and getting the trespass verified by the desk deputy, which was standard protocol. He also reported seeing the deputies searching the pockets of black males without probable cause." (*Id.* at ¶ 19.) When Edom reported this conduct, Major Brown "told [Edom] to be a team player and never reported the illegal, unlawful, and discriminatory practices of the deputies." (*Id.* at ¶ 20.)

Additionally, between 2004 and 2006, Edom was subjected to racist jokes by a corporal in the HCSO. "One such joke[] described white people who go to heaven as 'angels' and black people who go to heaven as 'bats.'" (*Id.* at ¶ 21.) On another occasion, the same corporal "stated that he could not leave his wallet on his desk because there were too many 'brothers' in the office." (*Id.* at ¶ 23.)

Edom reported these incidents to the Internal Affairs Section, which told him "to make a complaint to his commanding officer." (*Id.* at ¶ 24.) "No white employees that had complaints of racism against them were subjected to any investigation," and shortly after Edom complained, the HCSO conducted a retaliatory investigation against him. (*Id.* at ¶¶ 24, 25.) Specifically, Edom was falsely accused of calling a white employee a "cracker." (*Id.* at ¶ 25.) This claim was never substantiated. (*Id.*)

When employees spoke out and refused to cooperate in illegal activity, the HCSO fabricated internal investigations in retaliation. (*Id.* at ¶ 26.) For example, in 2004, "Ron McCalister, an African American employee [of the Sheriff's Office] sued [the Sheriff's Office and Chronister] for discrimination based upon race and alleged he was forced to retire." (*Id.* at ¶ 22.)

In 2011, after receiving grant money, Edom started a Boys and Girls Club in the Nuccio Recreation Center, an area with many at-risk children. (*Id.* at ¶ 28.) The Club opened a few years later, and "at the grand opening of the Club, white males Sheriff David Gee and [Chad Chronister] took credit for the creation of the Club, despite [Edom] being the organizer and grant writer." (*Id.* at ¶¶ 28–29.) Edom was never publicly mentioned for his work. (*Id.* at ¶ 29.) Similar lack of recognition also occurred to two other black male HCSO employees at the Sheriff's Office. (*Id.* at ¶ 29.)

The HCSO assigned Edom to the Club as a resource officer. (*Id.* at ¶ 30). Unfortunately, within a few years of the Club's opening, Edom received complaints about the Club Director's sexual misconduct. (*Id.* at ¶ 7.) Edom relayed these complaints to the HCSO but, unlike white employees, was told to report the misconduct to a civilian, the Club's Supervisor (Delilah Solomon). (*Id.* at ¶ 30.) Between 2013 and 2016, Edom continued to report various Club misconduct—including sexual misconduct, illicit drug use, people with criminal histories walking freely through the Club—to the HCSO. (*Id.* at ¶ 31–34.) When Edom reported the misconduct to Chronister and another officer, they threatened to "write him up if he kept reporting incidents related to the Club." (*Id.* at ¶ 35.) But Edom continued to do so throughout 2016. (*Id.* at ¶ 36.)

In July of 2016, a Club employee, Daniela Scantlebury, approached Edom to discuss her sexual life. (*Id.* at ¶ 41.) He reported the incident to the Club Director and to the Club's Supervisor but neither acted. (*Id.* at ¶¶ 41–43.) Around a month later, Scantlebury approached Edom again and started a sexually explicit conversation. (*Id.* at ¶ 44.) Once Edom "implied that the conversation was inappropriate," the conversation ended. (*Id.* at ¶ 45.) She then told a coworker that Edom "was saying things that made her uncomfortable." (*Id.* at ¶ 48.) Scantlebury's version of the incident was ultimately referred to the HCSO's Internal Affairs unit. (*Id.*) Detective Portalatin—the detective assigned to the investigation—interviewed the Club employee and the Club Director, did not

transcribe the interviews, and "opted to provide selective information while paraphrasing [the Club employee's] interview." (*Id.* at ¶¶ 50, 54.) Portalatin's "pattern of bias and misrepresentation" continued throughout the course of his investigation, which was marked with cherry-picked information presented in the least favorable light to Edom. (*Id.* at ¶ 55.) Ultimately, the allegedly false allegations of sexual harassment against Edom were substantiated and Edom's dismissal was recommended. (*Id.* at ¶ 61.)

In early September 2016, Edom learned that Chronister "was out to get him" and was partly responsible for initiating the investigation. (*Id.* at ¶ 56–57.) On November 11, 2016, Edom filed a charge with the Equal Employment Opportunity Commission (EEOC), alleging that the investigation had discriminated against him based on his race and sex. (*Id.* at ¶ 7; Doc. 17-1.)

Edom appealed the dismissal recommendation to Major Scott Wellinger, adamantly denying the accusations. (*Id.* at ¶ 63.) Major Wellinger disagreed, adding a charge of unbecoming conduct and recommending Edom's dismissal. (*Id.*) Edom then appealed to the Complaint Review Board. (*Id.* at ¶ 64.) At the conclusion of the hearing, four of the five Board members believed Edom should not be terminated. (*Id.* at ¶ 65.)

In December 2016, Edom took medical leave to recover from two surgeries. (*Id.* at ¶¶ 68–69.) For the next several months, Edom recovered and used his accumulated vacation and sick time. (*Id.* at ¶¶ 68–74.) But while he was on leave, the HCSO

implemented a new policy that automatically demoted any Master Deputy to Deputy after returning from medical leave. (*Id.* at ¶ 73.) Although this policy was not enforced against white employees, the HCSO demoted Edom upon his return. (*Id.* at ¶ 73.)

Although still in severe pain, Edom returned to work in July 2017 only to be confronted with another hearing, this time before the Discipline Review Board. (*Id.* at ¶ 75–76.) Chronister, a member of the Board, did not disclose his involvement in the Internal Affairs investigation and falsely stated that Edom had confessed. (*Id.* at ¶¶ 78–79.) Another member of the Board, Thea Clark, "scolded" Edom for filing his race discrimination charge with the EEOC. (*Id.* at ¶ 80.) After deliberating, the Board sustained the charges and recommended Edom's dismissal. (*Id.* at ¶ 82.) No white employees accused of similar conduct were terminated. (*Id.* at ¶ 83.)

The combined weight of false accusations, retaliation, disparate treatment, and harassment made Edom's "working conditions so intolerable that no reasonable person in his position would continue employment" with the HCSO. (*Id.* at ¶ 90.) Accordingly, on July 12, 2017, Edom approached the benefits supervisor and told her that he wanted to retire. (*Id.* at ¶ 90–91.) But she advised him that a colonel—who Edom believes was Chronister—had instructed her "not to allow him to retire but to force him to resign." (*Id.* at ¶ 91.) Under duress, Edom complied. (*Id.* at ¶ 91.) Unbeknownst to Edom, his resignation was entered as a termination. (*Id.* at ¶ 92.)

However, Chief Jose Docobo received the Board's recommendation of termination and overrode it. (*Id.* at ¶ 93.) He also modified Edom's records to show that he was not terminated, but that the HCSO accepted his resignation. (*Id.* at ¶¶ 93, 95.)

## II.     PROCEDURAL HISTORY

Edom sued Chronister in his official capacity as Sheriff of Hillsborough County and in his individual capacity in the Circuit Court of the Thirteenth Judicial Circuit, in and for Hillsborough County, on June 21, 2020. On July 15, Chronister removed the action to this Court. After Chronister filed a motion to dismiss, Edom filed an Amended Complaint. (Doc. 13.) Chronister again moves to dismiss for failure to state a claim upon which relief may be granted.

## III.    LEGAL STANDARD

To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must plead sufficient facts to state a claim that is "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). A claim is plausible on its face when a plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*,

550 U.S. 544, 555 (2007) (alteration in original) (citations omitted). "Factual allegations must be enough to raise a right to relief above the speculative level . . . ." *Id.*

When considering the motion, a court accepts all factual allegations of the complaint as true and construes them in the light most favorable to the plaintiff. *Pielage v. McConnell*, 516 F.3d 1282, 1284 (11th Cir. 2008) (citation omitted). Courts should limit their "consideration to the well-pleaded factual allegations, documents central to or referenced in the complaint, and matters judicially noticed." *La Grasta v. First Union Sec., Inc.*, 358 F.3d 840, 845 (11th Cir. 2004) (citations omitted).

## IV.   ANALYSIS

Edom claims Chronister violated his rights in both Chronister's individual and official capacities. But "[a] suit against a municipal officer in his official capacity is effectively a suit against the government entity that the officer represents." *Lopez v. Gibson*, 770 F. App'x 982, 991 (11th Cir. 2019). As a result, Edom's suit against Chronister in his official capacity is effectively an action against the Hillsborough County Sheriff's Office—the governmental entity that Chronister represents. *Id.*; *Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cnty.*, 402 F.3d 1092, 1115 (11th Cir. 2005). For clarity and convenience's sake, the Court will refer to these claims as being against the HCSO.

In Counts I and II, Edom alleges that the HCSO discriminated against him based on his race in violation of Chapter 760, Florida Statutes; Title VII; and 42 U.S.C. §§ 1981 & 1983.[2] In Count III, he alleges that the HCSO discriminated against him based on disability in violation of Chapter 760, Florida Statutes. In Count IV and Count V, Edom alleges Chronister and the HCSO retaliated against him for exercising his First Amendment rights. In Count VI Edom alleges "in the alternative" that the HCSO violated his right of equal protection under the Fourteenth Amendment. Finally, in Count VII and Count VIII, Edom alleges that the HCSO retaliated against him for reporting either race or sex discrimination in violation of Chapter 760, Florida Statutes, and 42 U.S.C. § 1981. Chronister and the HCSO argue that each Count should be dismissed for failure to state a valid claim for relief. For the following reasons, the Court agrees with respect to Counts I, III, IV, V, VII, and VIII.

### a.  Chronister Individual Capacity

In Count V of his Amended Complaint, Edom brings a First Amendment retaliation claim under 42 U.S.C. § 1983 against Chronister in his individual capacity. (Doc. 13 at ¶ 143.) Edom alleges that he "engaged in constitutionally protected activity by speaking on matters of public concern and beyond the scope of his job duties, including

---

[2] "Section 1983 provides for the imposition of liability upon any person who, acting under color of state law, deprives another of rights or privileges secured by the Constitution or laws of the United States." *Manor Healthcare Corp. v. Lomelo*, 929 F.2d 633, 637 (11th Cir. 1991).

[participating] in inquiries and investigations and otherwise speaking out on matters that are of public concern" and that "[a]fter engaging in this protected activity, [he] was the victim of retaliatory actions." (*Id.* at ¶¶ 146–47.) Although Edom pleads sufficient facts to state a First Amendment retaliation claim, his claim against Chronister in his individual capacity still fails because he has not satisfied the § 1983 requirements for individual liability.[3]

### i.   Edom States a Claim for First Amendment Retaliation

A First Amendment claim for retaliation is "governed by a four-stage analysis." *Moss v. City of Pembroke Pines*, 782 F.3d 613, 617 (11th Cir. 2015). To satisfy the first requirement, a public employee must speak both as a private citizen and on a matter of public concern. *Garcetti v. Ceballos*, 547 U.S. 410, 419–20 (2006); *Connick v. Myers*, 461 U.S. 138, 154 (1983). If this requirement is not satisfied, there is no First Amendment protection. *Id.* at 418. But if "the employee spoke as a citizen and on a matter of public concern, 'the possibility of a First Amendment claim arises,' and the inquiry becomes one of balance" under the *Pickering* test. *Alves v. Bd. of Regents of Univ. Sys. of Ga.*, 804 F.3d 1149, 1160 (11th Cir. 2015) (quotation omitted). Under *Pickering*, a court weighs a

---

[3] Chronister argues that he is entitled to qualified immunity. (Doc. 16 at 12–15.) Because Edom fails to state a claim of retaliation under the First Amendment against Chronister individually, the Court likewise agrees that Chronister is entitled to qualified immunity without needing to address the second inquiry of qualified immunity as to whether, at the time of the violation, the constitutional right was clearly established. *See, e.g.*, *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002).

plaintiff's First Amendment interests against the employer's interest in regulating employee speech. *See id.*; *Lane v. Franks*, 573 U.S. 228, 242 (2014). The third stage requires a plaintiff to show that his speech played a substantial role in his termination. *See Moss*, 782 F.3d at 618. If the plaintiff makes this showing, the burden shifts to the employer to supply an alternative reason for the termination. *Id.* Because these final two issues, "are questions of fact, a jury resolves them unless the evidence is undisputed." *Id.*

Viewing the facts in the light most favorable to Edom, he has alleged one of his comments was spoken as a citizen and on matters of public concern: the report of racism within the HCSO.[4] For the rest, Edom fails to plead facts sufficient to show he engaged in constitutionally protected speech—that is, that he spoke as a citizen on a matter of public concern.

"[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti*, 547 U.S. at 421. The "central inquiry" relevant here is "whether the speech at issue 'owes its existence' to the employee's professional responsibilities." *Moss*, 782 F.3d at 618

---

[4] Edom does not allege that Chronister retaliated for his reports about the Boys and Girls Club. (*See* Doc. 13 at ¶ 142 (omitting reference to the relevant paragraphs of the Amended Complaint, including ¶¶ 30–39).) He also does not reference his complaint to the EEOC as a ground for retaliation. (*See id.* at ¶ 142 (omitting reference to ¶ 7, which alleges that he filed a charge of discrimination with the EEOC around November 14, 2016).)

(quoting *Garcetti*, 547 U.S. at 421). Potentially relevant, non-dispositive factors include: "the employee's job description, whether the speech occurred at the workplace, and whether the speech concerned the subject matter of the employee's job." *Alves*, 804 F.3d at 1161. Stated otherwise, *"Garcetti*'s 'threshold layer' looks at both the 'role the speaker occupied' and 'the content of the speech' to determine whether the government retaliation at issue warrants the *Pickering* analysis." *Alves*, 804 F.3d at 1160 (quoting *Davis v. McKinney*, 518 F.3d 304, 312 (5th Cir. 2008)).

First, Edom cites his refusal to illegally drop charges when he was asked to do so by a superior. (Doc. 13 at ¶¶ 16 & 18.) Refusing to perform job-related functions on legal grounds is squarely within Edom's duties as an employee. *See Lane*, 573 U.S. at 240 ("The critical question under *Garcetti* is whether the speech at issue is itself ordinarily within the scope of an employee's duties."); *Garcetti*, 547 U.S. at 421–24 (finding a calendar deputy acted within the scope of his duties when he refused to sign off on an illegal warrant and raised his objections to superiors). Accordingly, this speech is not protected.

Second, Edom cites his repeated reports of racism within the HCSO. (*Id.* at ¶ 24.) Edom's report "concern[ed] information acquired by virtue of his public employment," but that "does not transform that speech into employee—rather than citizen speech." *Lane*, 573 U.S at 240 (holding that testifying under subpoena on misconduct the employee only learned as an employee was speaking as a citizen). Here, Edom was complaining not about

interference with his own job responsibilities, but about widespread racism inside the HCSO. *See King v. Bd. of Cnty. Comm'rs*, 916 F.3d 1339, 1349 (11th Cir. 2019) (holding that a medical examiner's internal complaints, "[a]t bottom," were motivated by "frustration at work, not fear for public safety"). Edom plausibly alleges that these reports were outside the narrow scope of employee speech that the Supreme Court has determined is not protected. *See Alves*, 804 F.3d at 1162 ("After *Lane*, the exception to First Amendment protection in *Garcetti* . . . must be read narrowly to encompass speech that an employee made in accordance with or in furtherance of the ordinary responsibilities of her employment, not merely speech that concerns the ordinary responsibilities of her employment."). Chronister does not explain in his motion why reports of discrete incidents of racism observed by Edom against *other* employees falls within "the scope of [Edom's] duties" instead of merely related to them. *See Lane*, 573 U.S. at 240.

For Edom's reports of racism to qualify for First Amendment protection, they must also have been made on a matter of public concern. Public concern is a broad category, including "any matter of political, social, or other concern to the community." *Connick*, 461 U.S. at 146, as opposed to "matters of only personal interest," *Alves*, 804 F.3d at 1163. "If the 'main thrust' of a public employee' speech is on a matter of public concern, the speech is protected." *Id.* at 1162.

Edom's comments are plausibly of public concern. Edom reported racist remarks he overheard in a supervisor's office, (Doc. 13 at ¶ 23), that another employee was forced to resign for alleging discrimination, (*Id.* at ¶ 22), that deputies were stopping black males because of race and were "searching the pockets of black males without probable cause," (*Id.* at ¶ 19). Surely racism in a law enforcement agency is "a subject of legitimate news interest" or of "general interest and of value and concern to the public." *Alves*, 804 F.3d at 1162 (quoting *Snyder v. Phelps*, 562 U.S. 443, 453 (2011)).

Since Edom complained to Internal Affairs about the racism within the HCSO as a citizen and on a matter of public concern, "the possibility of a First Amendment claim arises." *Garcetti*, 547 U.S. at 418. Now, "[t]he question becomes whether [the HCSO] had an adequate justification for treating the employee differently than any other member of the general public." *Id.* This inquiry requires the Court to weigh Edom's speech against the employer's interest in evaluating that speech to prevent disruption. As an employer, a municipality will "often have legitimate 'interest[s]'" in "promot[ing] efficiency and integrity in the discharge of official duties and maintain[ing] proper discipline in public service.'" *Lane*, 573 U.S. at 242 (quoting *Connick*, 461 U.S. at 150–51).

The parties say little on this point.[5] Chronister does no more than note that Edom "must plausibly allege that his speech interests outweighed the employer's interest in effective and efficient fulfillment of its responsibilities." (Doc. 16 at 5.) This point of law is of course true. But it is not an argument that Edom has not done so. Accordingly, at this stage of the litigation, "the employer's side of the *Pickering* scale is entirely empty: [Chronister] do[es] not assert . . . any government interest that tips the balance in [his] favor." *Lane*, 573 U.S. at 242.

Even if the HCSO has the usual interests in preventing disruption from false claims and maintaining internal discipline, these might not outweigh Edom's exercise of his First Amendment rights to disclose serious law violations, unequal treatment, and an atmosphere of racism. And at this stage, Edom need do no more than raise a plausible claim that his interests in his speech outweigh those of the HCSO in restricting his speech. He has done that.

Accordingly, Edom has plausibly alleged a claim that the First Amendment protects his speech. "In sum, at the motion to dismiss stage, the Court cannot conclude, as a matter of law, that [Edom's] speech was not protected." *Brien v. Romine*, No. 8:13-CV-74-T-30MAP, 2013 WL 2285070, at *4 (M.D. Fla. May 23, 2013) (Moody, J.).

---

[5] Edom's reply focuses on the value of his reports about the misconduct at the Boys and Girls Club, but Count V of the Amended Complaint does not incorporate reference to those paragraphs and therefore cannot form the predicate speech for Count V.

Because the next steps of the First Amendment retaliation claim involve "questions of fact," the Court will not address them now. *See Battle v. Bd. of Regents of Ga.*, 468 F.3d 755, 760 (11th Cir. 2006). Instead, the Court moves on to the remaining obstacle to Edom successfully stating a claim: whether Chronister was a final decisionmaker under § 1983.

### ii. Chronister is Not Individually Liable under Section 1983

For individual liability to attach under 42 U.S.C. § 1983, the alleged actor must have the power to make decisions. *See Quinn v. Monroe Cnty.*, 330 F.3d 1320, 1326 (11th Cir. 2003) ("The 'decisionmaker' inquiry addresses who has the power to make official decisions and, thus, be held *individually* liable."). Authority to "merely *recommend*" or influence decisions is not sufficient. *Id.* at 1328. "At times, a discharge recommendation by a party without actual power to discharge an employee may be actionable," but only if the recommendation "directly resulted in the employee's discharge." *Gilroy v. Baldwin*, 843 Fed. App'x 194, 196 (11th Cir. 2021) (quoting *Stimpson v. City of Tuscaloosa*, 186 F.3d 1328, 1331 (11th Cir. 1999)).

Edom alleges that "Chronister was a final decisionmaker," (Doc. 13 at ¶ 153), but fails to allege facts showing Chronister had a decisive role in Edom's termination.[6] Instead,

---

[6] Edom also alleges he was demoted for three years in retaliation for his refusing Captain Rodriguez's request to drop charges against a suspect. (Doc. 13 at ¶¶ 15–17.) But this speech is not protected because Edom spoke as an employee, not a citizen. Also, Chronister's name never arises in this narrative, making it implausible that he could be individually liable for it under § 1983.

Edom's account shows Chronister played a behind-the-scenes role in Edom's constructive termination,[7] and that higher authorities within the HCSO countermanded his designs.

Detective Portalatin ran the Internal Affairs investigation, (*id.* at ¶¶ 49–55), not Chronister. Portalatin omitted evidence from his report, (*id.* at ¶¶ 50–52), exhibited a "pattern of bias and misrepresentation," (*id.* at ¶ 55), and attempted to incriminate Edom, (*id.*). At the conclusion of Portalatin's investigation, Edom's dismissal "was recommended." (*Id.* at ¶ 61.) At most, Chronister's role in this investigation was slight. The investigation was launched "in part" because Chronister "was out to get [Edom]." (*Id.* at ¶ 56–57.) But initiating an investigation is not the same as making a final decision to terminate.

Next, it was Major Wellinger, not Chronister, who recommended Edom's dismissal to a Discipline Review Board. (Doc. 13 at ¶ 76.) True, Chronister participated on this six-member Board. (*Id.*) But he was only one of its members. (*Id.*) Even if Chronister could be entirely responsible for the Board's ultimate determination, that would not be enough for him to be a final decisionmaker. The Eleventh Circuit has contrasted the authority to "merely *recommend* [a plaintiff's] termination," from the power to "immediately effectuate [his] termination." *Quinn*, 330 F.3d at 1328. The former is insufficient for "a power to make official decisions," *id.* at 1326, and that is all the Board—and Chronister with a one-

---

[7] *See Bell v. Sheriff of Broward Cnty.*, 6 F.4th 1374, 1377 (11th Cir. 2021) (concluding constructive discharge is an adverse employment action).

sixth vote—could do under Edom's recitation of the facts. (Doc. 13 at ¶ 82 (saying the Board "recommended Defendant HCSO dismiss" Edom).) The Board's limited power is revealed when Chief Jose Docobo "overrode the [Board's] recommendation." (*Id.* at ¶ 93.) Portalatin, Wellinger, and the Board had the power only to recommend dismissal, not the power to "immediately effectuate [his] termination." *Quinn*, 330 F.3d at 1328.

And even then, Edom was never officially terminated. (Doc. 13 at ¶ 90.) Edom "attempted to retire" because of the "harassment, disparate treatment and retaliation" he was experiencing at the HCSO. (*Id.* at ¶ 82.) But a benefits officer—possibly acting on Chronister's orders—forced Edom to resign. (*Id.* at ¶ 91.)

Taken altogether, at most Chronister partly initiated the investigation, participated in the Board's biased recommendation, and potentially influenced a benefits officer to force Edom to resign. Or as Edom puts it, "Chronister interfered in the decision-making process as it relates to his employment decision and injected control over the board." (Doc. 23 at 14.) But no level of influence or control is enough here because the Board itself only "recommended" dismissal, and Chief Docobo "overrode the recommendation." And Chronister, who Edom notes "was a colonel" in September of 2016, could not have countermand the Chief's termination decision. (Doc. 13 at ¶¶ 57, 91.)

Finally, the path from the initial recommendation to the Board's recommendation, to Docobo's review, to the benefits officer's pressure, to Edom's resignation hardly show

that Chronister's acts "immediately effectuate[d his] termination," *Quinn*, 330 F.3d at 1328, or "directly resulted in the employee's discharge." *Stimpson*, 186 F.3d at 1331. Simply put, Edom fails to allege that Chronister was the final decisionmaker, and thus cannot state a claim for individual liability under § 1983. The Court dismisses Count V.

### b. Chronister Official Capacity

In his Amended Complaint, Edom brings the following claims against Chronister in his official capacity: race discrimination under the Florida Civil Rights Act, Title VII, and 42 U.S.C. § 1981 (Counts I and II); disability discrimination under FCRA (Count III); First Amendment retaliation (Count IV); Equal Protection violations under the Fourteenth Amendment (Count VI); retaliation under FCRA (Count VII); and retaliation under § 1981 (Count VIII).[8] For clarity and convenience, the Court refers to these claims as being against the HCSO.

Edom brings Tile VII, § 1981, and Fourteenth Amendment claims pursuant to 42 U.S.C. § 1983. Municipalities—like the HCSO—cannot be held liable on a theory of respondeat superior, or acts committed by its officers. *See Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658, 691, 693–94 (1978). Rather, the HCSO could be held liable under three theories of municipal liability: (1) for official policies; (2) if final policymakers acquiesce to a longstanding practice; or (3) if a final policymaker ratifies the

---

[8] Edom clarifies in his response that he is not bringing a hostile work environment claim. (Doc. 23 at 16.)

unconstitutional act and motive of a subordinate. *See Hoefling v. City of Miami*, 811 F.3d 1271, 1279 (11th Cir. 2016) (citing *Matthews v. Columbia Cnty.*, 294 F.3d 1294, 1297 (11th Cir. 2002)). Under this third theory, the final policymaker "must ratify not only the decision itself, but also the unconstitutional basis for it." *Matthews*, 294 F.3d at 1297 (citing *Gattis v. Brice*, 136 F.3d 724, 727 (11th Cir. 1998)). Each of Edom's claims must plausibly support a theory of municipal liability.

### i. First Amendment Retaliation

Edom brings a claim of First Amendment retaliation under 42 U.S.C. § 1983 in Count IV against the HCSO. The analysis for this claim is much the same as that for Count V, which is against Chronister in his individual capacity.

Taking his factual allegations as true, Edom plausibly states that the HCSO employees retaliated against him for his reports of racism, and his charge to the EEOC over the investigation of sexual misconduct from Edom's conversation with Scantlebury in November of 2016.[9] Edom suffered an adverse employment action when he alleges that he

---

[9] There is confusion on what speech Edom alleges that he was retaliated against for. Edom admits that it is "not his speech inside the internal investigation" because he did not speak "as a citizen." (Doc. 23 at 6.) But he argues his reports about the Simmons Boys and Girls Club are included. (*Id.* at 4–5.) But—like Count V—Count IV does not incorporate reference to these paragraphs. So, they are not properly alleged in this Count. That said, these comments were likely within the scope of Edom's official duties since he was "stationed" at the Club, (*Id.* at 5; Doc. 13 at ¶ 30), and made reports to his supervisors as an "employee of HCSO," (Doc. 13 at ¶ 30), that concerned matters of illegality and obvious wrongdoing. (*Id.* at ¶¶ 31–34, 36.) And although Edom does not argue in his response to the motion to dismiss that his reports of racism and the EEOC complaint constitute the protected First Amendment speech, the Court must review the Amended Complaint in the light most favorable to Edom—even if it is a light by which he does not read his own pleading.

was pressured into resigning, which constitutes a constructive termination. *See Bell v. Sheriff of Broward Cnty.*, 6 F.4th 1374, 1377 (11th Cir. 2021) (noting that "constructive discharge is an adverse employment action" (citing *Akins v. Fulton Cnty.*, 420 F.3d 1293, 1300–02 (11th Cir. 2005))). But a "local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents." *Monell*, 436 U.S. at 694. Count V failed because Edom did not plausibly allege that Chronister was a final decisionmaker, a necessary condition for *individual* liability under § 1983. Under Count IV, however, Edom must establish *municipal* liability.

As explained above, the HCSO may only be held liable as a municipality (1) for its official policies; (2) if final policymakers acquiesce to a longstanding practice or a standard operating procedure; or (3) if a final policymaker ratifies a subordinate official's unconstitutional decision. *Hoefling*, 811 F.3d at 1279. Edom must allege facts to support one of these theories. He fails to do so.

When a plaintiff alleges only a single act of wrongdoing, that act must have either been performed by the municipality's final policymaker or ratified by that policymaker, who must have had knowledge of the illegal motive behind the wrongdoing. *See Maschmeir v. Scott*, 269 F. App'x 941, 943 (11th Cir. 2008). In turn, a final policymaker is a person who has the power to set municipal policy. In contrast, "a municipal official does not have final

policymaking authority...when that official's decisions are subject to meaningful administrative review." *Scala v. City of Winter Park*, 116 F.3d 1396, 1401 (11th Cir. 1997).

Edom says that the HCSO—"through its decisionmakers and other upper-level personnel, including Chronister[—]were the final policymakers in [Edom's] termination" and the "final decision makers in the decisions to take adverse employment actions against [Edom] after he engaged in protected First Amendment activity." (Doc. 13 at ¶ 135, 136.) But Edom's account does not support those assertions. The Amended Complaint shows no official policy or final policymaker who approved of the unlawful actions against him.[10] As the HCSO points out, "any recommendation to terminate Edom's employment had to go through various stages of review including the Complaint Review Board, the Discipline Review Board, and Chief Deputy Jose Docobo," who Edom alleges overruled the earlier review boards' recommendation of termination. (Doc. 17 at 11.)

The Amended Complaint alleges that Chronister was partly responsible for initiating the investigation. (Doc. 13 at ¶ 57.) Detective Portalatin pursued it and presumably tendered the recommendation of dismissal. (*Id.* at ¶¶ 49–55, 58–61.) Major Wellinger ratified the charges. (*Id.* at ¶ 63.) The Complaint Review Board conducted a hearing and disagreed with the recommendation of termination. (*Id.* at ¶¶ 64–65.) The

---

[10] A plaintiff need not prove a "final policymaker acted on behalf of a municipality" at the motion to dismiss stage, as it "is an evidentiary standard, and not a pleading standard." *Hoefling*, 811 F.3d at 1280 (quotation omitted). However, Edom must allege *some* theory of municipal liability, be it "policy, practice, or custom." *Id.*

Discipline Review Board held a second hearing and added its dismissal recommendation. (*Id.* at ¶¶ 76–82.) One Board member—Thea Clark—scolded Edom for his EEOC charge, possibly indicating that she voted to dismiss him in retaliation. (*Id.* at ¶ 80.) Finally, Chief Docobo received the recommendation. For Edom to succeed on this theory of municipal liability the final policymaker "must ratify not only the decision itself, but also the unconstitutional basis for it." *Matthews*, 294 F.3d at 1297 (citing *Gattis v. Brice*, 136 F.3d 724, 727 (11th Cir. 1998)). Instead of either ratifying the unconstitutional basis or the decision itself, Chief Docobo overrode it. (Doc. 13 at ¶ 93, 95.)

Clearly, none of the prior actions can be the acts of a final policymaker. *See Scala*, 116 F.3d at 1401 ("[A] municipal official does not have final policymaking authority . . . when that official's decisions are subject to meaningful administrative review."). "Because [Docobo had] the power to reverse any termination made by [Chronister, Portalatin, or the Board], [they are] not [] final policymaker[s] with respect to termination decisions…." *Quinn*, at 330 F.3d at 1326.

And Chief Docobo himself cannot be the missing final decisionmaker either because—rather than ratifying the unlawful retaliation—he rejected it. (Doc. 13 at ¶¶ 93, 95.); *see Scala*, 116 F.3d at 1400 ("It would be a different matter if a particular decision by a subordinate was cast in the form of a policy statement and expressly approved by the supervising policymaker."). To be sure, Chief Docobo's review of the prior

recommendations and his decision to reject them defeats any assertion that the HCSO had an official *policy* of punishing employees who spoke out as Edom did. *See id.* at 1403 ("Barrett and Younger may or may not have had proper motives when they initiated Scala's termination…, [but] the City cannot be held liable for it under § 1983, because neither Barrett nor Younger are final policymaking authorities with respect to terminations…. There being no evidence that the Board ratified any improper basis for Scala's termination….").

The only facts outstanding are these: Edom was pressured into resigning by a benefits officer who, in turn, was pressured by someone else—possibly Chronister, who was a colonel at the time. (Doc. 13 at ¶ 91.) After he resigned, the resignation was secretly transformed into a Red Separation, or a termination. (*Id.* at ¶ 92.) But Chief Docobo overrode this too, converting Edom's Red Separation back into a Green Separation, indicating that he had not been terminated but that the HCSO had accepted Edom's resignation. (*Id.* at ¶¶ 93, 95.) Once again, Chief Docobo acted as a final policymaker, and he consistently rejected the acts Edom alleges were unlawful. Accordingly, Edom cannot show either an official HCSO policy or that specific wrongful acts were approved by an HCSO official with policymaking authority. Instead, he suffered a wrong from individual employees, not the municipality itself. And that is insufficient to state a claim under

§ 1983. *See Monell*, 436 U.S. at 694 ("[A] local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents.").

That said, absence of an official policy or an illegal decision made or ratified by a final policymaker it not always fatal. While the "allegation that [an] official policy is responsible for a deprivation of rights" is the "touchstone of the § 1983 action against a government body," it is possible for an unofficial practice to be so "persistent and widespread" that it constitutes an actionable "custom." *Monell*, 436 U.S. at 690–91 (quotations omitted). "To prove § 1983 liability against a municipality based on custom, a plaintiff must establish a widespread practice that, 'although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law.'" *Brown v. City of Fort Lauderdale*, 923 F.2d 1474, 1481 (11th Cir. 1991) (quoting *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988)). "In other words, a longstanding and widespread practice is deemed authorized by the policymaking officials because they must have known about it but failed to stop it." *Id.* Illegal acts must be widespread or pervasive to qualify, as the "purposes of § 1983 would not be served by treating a subordinate employee's decisions as if it were a reflection of municipal policy." *Praprotnik*, 485 U.S. at 130.

Edom fails to allege an HCSO custom or widespread practice of retaliating against its employees who complain. A "custom" is a "widespread practice that, although

[unofficial], is so permanent and well settled as to constitute a custom or usage with the force of law." *Gilroy*, 843 F. App'x at 198 (citing *Monell*, 463 U.S. at 691). Edom alleges that the wrongful acts he recounts are "not unique events" and that "[o]n information and belief, [the HCSO committed] further similar events or wrongful actions" with "such events combining to determine a pattern of similar wrongful and illegal behavior," (Doc. 13 ¶ 139), but such "conclusory statements"—without additional facts or relevant examples—"do not suffice" to state a claim. *Iqbal*, 556 U.S. at 697; *see Twombly*, 550 U.S. at 555 (reasoning that courts need not accept a "legal conclusion couched as a factual allegation" (quotation omitted)).

At bottom, Edom attempts to "treat[] a [few] subordinate employee[s'] decisions as if [they] were a reflection of municipal policy." *Praprotnik*, 485 U.S. at 130. Edom has not presented facts of an official policy accepted by a final policymaker or of "a series of decisions by subordinate official[s that] manifested a 'custom or usage' of which the supervisor must have been aware." *Id.*; *see Depew v. City of St. Marys*, 787 F.2d 1496, 1499 (11th Cir. 1986) ("[R]andom acts or isolated incidents are insufficient to establish a custom or policy."). Without a viable theory of municipal liability, Edom cannot allege a claim under § 1983 for First Amendment retaliation. The Court dismisses Count IV.

### ii.  Race Discrimination

Edom brings claims of race discrimination under Title VII, FCRA, and 42 U.S.C. § 1981 in Counts I and II. (Doc. 13 at ¶¶ 98, 104, 107, 113.) Edom also brings a Fourteenth Amendment equal protection claim "in the alternative" in Count VI. (*Id.* at ¶ 158.)[11] These claims utilize the same framework and courts analyze them together. *See Fuller v. Edwin B. Stimpson Co. Inc.*, 598 F. App'x 652, 653 (11th Cir. 2015) (explaining that "[t]he FCRA is modeled after Title VII, and claims brought under it are analyzed under the same framework"); *Harrison v. Belk, Inc.*, 748 F. App'x 936, 941 (11th Cir. 2018) ("The elements of a section 1981 claim in the employment context are the same as the elements of a Title VII claim."); *Lewis v. City of Union City*, 934 F.3d 1169, 1185 (11th Cir. 2019) (reasoning that the "elements under [Title VII, the Equal Protection Clause, and § 1981] are identical").

That said, there are differences between these claims. One difference, which turns out to be decisive here, is that Title VII and FCRA have administrative exhaustion requirements, while Fourteenth Amendment and § 1981 claims are more lenient. Although Edom states a claim of race discrimination under Title VII, FCRA, § 1981, and the Fourteenth Amendment, the Court dismisses Edom's Title VII and FRCA claims under Count I for failure to timely exhaust administrative remedies.[12]

---

[11] Edom's Title VII, § 1981, and Fourteenth Amendment claims are brought pursuant to § 1983.

[12] Edom states two causes of action under Count I: Title VII and FCRA. As such, he "commits the sin of not separating into a different count each cause of action or claim for relief." *Weiland v. Palm Beach Cty. Sheriff's Off.*, 792 F.3d 1313, 1323 (11th Cir. 2015). Since the Court dismisses this Count for failure to

## 1. Edom States a Claim of Race Discrimination

Title VII of the Civil Rights Act of 1964 prohibits discrimination by covered employers on the basis of race, color, religion, sex, or national origin. *See* 42 U.S.C. § 2000e. In the absence of direct evidence, courts analyze Title VII claims based on circumstantial evidence under the *McDonnell Douglas* burden-shifting framework. *See McDonnel Douglas Corp. v. Green*, 411 U.S. 792 (1973). To establish a prima facie case under *McDonnell Douglas*, Edom must show that "(1) [he] belongs to a protected class; (2) [he] was qualified to do the job; (3) [he] was subjected to adverse employment action; and (4) [his] employer treated similarly situated employees outside [his] class more favorably." *Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008). Of course, the prima facie case under *McDonnell Douglas*, is an evidentiary standard that applies to later stages in the case; it not a pleading requirement. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510 (2002); *Bell Atl. Corp.*, 550 U.S. at 569–70 (noting that "a complaint in an employment discrimination lawsuit [need] not contain specific facts establishing a prima facie case of discrimination"); *Castillo v. Allegro Resort Mktg.*, 603 F. App'x 913, 917 (11th Cir. 2015) ("[The *McDonnell Douglas*] burden-shifting analysis is an evidentiary standard, not a pleading requirement, and thus it applies only to summary judgment motions and beyond."). To withstand a motion to dismiss, Edom "must provide enough factual matter

---

state a claim, the infraction does not matter here. However, in the future this Court will strike Counts that contain multiple causes of action as impermissible shotgun pleadings.

(taken as true) to suggest intentional discrimination." *Castillo*, 603 F. App'x at 917 (quotation and punctuation omitted). Edom meets that burden.

Edom alleges numerous instances of personal and office-wide race discrimination that are sufficient to suggest a custom or policy of intentional discrimination. *See id.* at 917. For example, Edom and other minority officers were not permitted to take advancement courses for promotion—unlike his white colleagues.[13] (Doc. 13 at ¶¶ 11–12.) The HCSO suspended Edom for three days after he unintentionally discharged his gun. (*Id.* at ¶ 66.) White officers, like Colonel Kristine Poore, were not disciplined for similar discharges. (*Id.* at ¶¶ 65–67.) Edom was demoted for taking medical leave according to a new policy that the HCSO did not enforce against white employees. (*Id.* at ¶ 71–73.) The Discipline Review Board recommended that the HCSO dismiss Edom based on unsubstantiated allegations that Edom made inappropriate comments to a coworker. (*Id.* at ¶ 82.) In contrast, white employees who had affairs with coworkers were not fired. (*Id.* at ¶¶ 83–85.) Edom specifically points to Major Wellinger, who retired with full benefits after an investigation revealed his affair with a subordinate. (*Id.* at ¶¶ 85, 94.) Edom meanwhile was forced to resign and was treated for a time as if he had been fired. (*Id.* at ¶ 94.) Considered together, Edom alleges enough discriminatory acts to suggest that the

---

[13] Any applicable statute of limitations would not "bar an employee from using the prior acts as background evidence in support of a timely claim." *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002).

discrimination was "intentional," *Castillo*, 603 F. App'x at 917 (quotation omitted). And that is enough to plausibly state a claim for racial discrimination under Title VII, the Equal Protection Clause, § 1981, and FRCA.

But, since Edom brings his race discrimination claims under Title VII, the Equal Protection Clause, and § 1981 through § 1983, he must also plausibly demonstrate municipal liability under § 1983. "To prove § 1983 liability against a municipality based on custom, a plaintiff must establish a widespread practice that, 'although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law.'" *Brown*, 923 F.2d at 1481 (quoting *Praprotnik*, 485 U.S. at 127). "In other words, a longstanding and widespread practice is deemed authorized by the policymaking officials because they must have known about it but failed to stop it." *Id.*

The HCSO argues Edom fails to establish municipal liability because he does not identify a policymaker. But failing to list a final policymaker does not defeat Edom's claim at the motion to dismiss stage. Although Edom may "ultimately have to identify (and provide proof concerning) a single final policymaker in order to survive summary judgment," he is not required to "name that person in his complaint." *Hoefling*, 811 F.3d at 1280 ("We therefore believe that identifying and proving that a final policymaker acted

on behalf of a municipality is an evidentiary standard, and not a pleading requirement." (quotation omitted)).

All Edom must allege at this stage is an HCSO "policy, practice, or custom" that violated his rights. *Id.* He has done that. The same alleged facts above that support an inference of intentional discrimination also suffice here to plausibly suggest "widespread" and "well settled" racially discriminatory activities for municipal liability under § 1983. *Gilroy*, 843 F. App'x at 198. The Court denies the HCSO's motion to dismiss Count II and Count VI.

### 2. Edom Failed to Exhaust Administrative Remedies for Title VII and FCRA Claims

Unlike § 1981 and Fourteenth Amendment claims, a plaintiff must exhaust administrative remedies before filing a suit for employment discrimination under Title VII and FCRA. *See EEOC v. Joe's Stone Crabs, Inc*, 296 F.3d 1265, 1271 (11th Cir. 2002). The initial requirement is filing a charge of discrimination with either the EEOC or the Florida Commission on Human Rights (FCHR). But the federal and state statutes impose different deadlines. "For a [Title VII] charge to be timely in a deferral state such as Florida, it must be filed within 300 days of the last discriminatory act." *Id.* at 1271; *see* 42 U.S.C. § 2000e-5(e)(1) (requiring that a charge "be filed by or on behalf of the person aggrieved within three hundred days after the alleged unlawful employment practice occurred"). For a FCRA claim to be timely, a plaintiff must file "within 365 days of the alleged violation."

§ 760.11(1), Fla. Stat. Edom filed his complaint with the EEOC on November 11, 2016. Any discriminatory acts for which Edom did not file a charge with either the EEOC or FCHR within 300 days (for Title VII) or 365 days (for FCRA) are not actionable. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002); *Shedrick v. Dist. Bd. of Tr. of Miami-Dade Coll.*, 941 F. Supp. 2d 1348, 1365–66 (S.D. Fla. 2013).

Edom argues that some of the acts of discrimination he alleges in his Amended Complaint constitute a continuing violation. (Doc. 23 at 17.) He points out that "an otherwise time-barred claim may be revived… if it is part of a pattern or continuing practice out of which the timely filed incident arose." (*Id.* at 17.)

Edom's account of the doctrine would transform all the discriminatory acts perpetrated against him from 1996 to 2017 into one ongoing violation, provided the acts are "plausibly or sufficiently related." *Morgan*, 536 U.S. at 114. But the Supreme Court rejected this approach, saying that "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges." *Id.* at 113. Instead, the Supreme Court held that discrete acts—like termination—are separate acts of discrimination. *Id.* at 113–14 ("Each discrete discriminatory act starts a new clock for filing charges alleging that act. The charge, therefore, must be filed within the 180– or 300–day time period after the discrete discriminatory act occurred."). The 300-day (or 365-day) clock starts ticking when a reasonably prudent employee would understand that his rights

are being violated. *See Hipp v. Liberty Nat'l Life Ins. Co.*, 252 F.3d 1208, 1222 (11th Cir. 2001).

As applied here, Edom cannot rely on the continuing violation doctrine for discrimination that occurred before January 16, 2016, unless it serves to clarify the focus of a timely-filed EEOC charge. *See Kelly v. Dun & Bradstreet, Inc.*, 557 F. App'x 896, 887 (11th Cir. 2014). For example, the HCSO's decision to deny Edom access to classes required for advancement based on his race in 1996 was sufficient to put him on notice of the violation of his rights and to trigger the 300-day statutory period for filing a complaint with the EEOC or FCHR. *See Joe's Stone Crabs, Inc.*, 296 F.3d at 1272 ("[The] failure to hire the claimants because they were women—were discrete, one-time employment events that should have put the claimants on notice that a cause of action had accrued."). The 300-day clock began "running at the time [Edom] receive[d] notice of the subject adverse employment action." *Kelly*, 557 F. App'x at 898. Time has unquestionably run out; separate acts of discrimination more than 300 days (365 days for FCRA) before Edom's EEOC charge on November 11, 2016, are not actionable. *See Roberts v. Gadsden Mem'l Hosp.*, 835 F.2d 793, 800 (11th Cir. 1988) (The continuing violation doctrine "does not exist to give a second chance to an employee who allowed a legitimate Title VII claim to lapse.").

In its motion to dismiss, the HCSO asserts that every instance of discrimination *after* Edom's EEOC complaint in November of 2016—including his constructive discharge in July of 2017—is also barred for failing to exhaust administrative remedies. (Doc. 17 at 23, 25.) The Court agrees.

It is "inappropriate" to bring a judicial suit for "new acts of discrimination" that are not alleged in the administrative complaint. *Gregory v. Ga. Dep't of Hum. Res.*, 355 F.3d 1277, 1279–80 (11th Cir. 2004). "The purpose of the exhaustion requirement is to allow the EEOC the first opportunity to investigate the alleged practices and to perform its role 'in obtaining voluntary compliance and promoting conciliation efforts.'" *Duble v. FedEx Ground Package Sys., Inc.*, 572 F. App'x 889, 892 (11th Cir. 2014) (citing *Gregory*, 355 F.3d at 1279)). A plaintiff may bring acts occurring after he filed an EEOC charge if they "can reasonably be expected to grow out of the charge of discrimination." *Alexander v. Fulton Cnty.*, 207 F.3d 1303, 1332 (11th Cir. 2000) (quotation omitted). But "new acts of discrimination that are offered as the essential basis for requested judicial review are not appropriate absent prior EEOC consideration." *Kelly*, 557 F. App'x at 899.

Edom filed his EEOC charge in November of 2016.[14] He accused the HCSO of race and sex discrimination based on his transfer to a new patrol area during the

---

[14] The Court takes judicial notice of Edom's EEOC complaint attached to the HCSO's motion to dismiss, (Doc. 17-1.), pursuant to Federal Rule of Evidence 201(b). *See Horne v. Potter*, 392 F. App'x 800, 802 (11th Cir. 2010) (district court may judicially notice an EEOC right-to-sue letter appended to defendant's motion to dismiss when central to plaintiff's claim and undisputed); *Bryant v. Avado Brands,*

investigation into Edom's August 2016 conversation with Scantlebury. (Doc. 17-1.) Edom was constructively terminated in July of 2017, several months after the EEOC complaint. (Doc. 13 at ¶ 90.) Edom has not alleged that he filed a new complaint with the EEOC or that he informed the EEOC of this development.

Accordingly, "[Edom's] termination claims relate to a discrete act of alleged discrimination that occurred after he filed his initial charge." *Double*, 572 F. App'x at 893 (holding that an employee with an outstanding EEOC claim who "had the opportunity to amend [it] or file a new charge," but "chose not to" do so "failed to exhaust his administrative remedies regarding his termination claims"); *see Morgan*, 536 U.S. at 114 ("[E]ach retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice.'"). Such discrete "acts of discrimination, such as termination or failure to promote, that occur after the filing of an EEOC complaint must first be administratively reviewed before they may serve as a basis for a judicial finding of discriminatory conduct." *Kelly*, 557 F. App'x at 899; *see Ellison v. Brennan*, No. 3:19-cv-726-J-34PDB, 2020 WL 2523287, at *2 (M.D. Fla. May 18, 2020) (Howard, J.) (concluding that an employee's suspension did not grow out of her initial EEOC complaint of retaliation because it was a discrete instance of discrimination).

---

*Inc.*, 187 F.3d 1271, 1277–81 (11th Cir. 1999) (district court may judicially notice "relevant public documents"—an SEC filing—without converting a motion to dismiss into summary judgment); *see also Ellison v. Brennan*, No. 3:19-cv-726-J-34PDB, 2020 WL 2523287, at *2 (M.D. Fla. May 18, 2020) (Howard, J.) (collecting similar cases).

Accordingly, all the events occurring 300 days (365 days for FCRA) or more before November 11, 2016, are time barred. So too, all separate instances of discrimination after Edom filed his EEOC complaint on November 11, 2016—including his constructive termination—are barred for failure to exhaust administrative remedies.

With both ends gone, there are few viable acts of discrimination with which to assert a claim left in the middle. Edom's race discrimination claims are centered on his constructive termination post his EEOC charge; in the Amended Complaint he does not mention the transfer that was the sole concern of his EEOC charge. The Court thus dismisses Count I, Edom's race discrimination claims under Title VII and FCRA.

### iii.   Retaliation under Section 1981 and FCRA

Edom brings claims of retaliation against the HCSO under FCRA,[15] and 42 U.S.C. § 1981 (through § 1983) in Counts VII and VIII. To state a prima facie claim under § 1981 or FCRA, a plaintiff must have (1) engaged in protected activity, and (2) suffered an adverse action, that (3) is causally connected to the protected activity. *See Goldsmith v. Bagby Elevator Co., Inc*, 513 F.3d 1261, 1277 (11th Cir. 2008) (requirements for § 1983); *Jiles v. United Parcel Serv., Inc*., 360 F. App'x 61, 65 (11th Cir. 2010) (requirements for FCRA retaliation). Applied here, Edom must establish a causal link between his

---

[15] The FCRA makes it unlawful "to discriminate against any person because that person has opposed any practice which is an unlawful employment practice under this section." § 760.10(7), Fla. Stat.

constructive termination and his reports of racial or sexual discriminatory employment practices. Edom has done that.

For his protected activity, Edom cites the reports he made about conditions within the HCSO from 1994 to 2016. Most of these complaints are simply too old to support a plausible inference of a retaliatory firing in July of 2017. *See Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (2007) (reasoning that even a three-month period between a complaint and termination was too long).

Other complaints do not qualify because they do not concern unlawful employment practices. For example, in Edom's response to the motion to dismiss, Edom cites to paragraphs 30–39 of his Amended Complaint as the "statutorily protected expression." (Doc. 23 at 16.) But these paragraphs are not realleged in either Count VII or Count VIII, so they are not relevant for purposes of these claims. There is also a more substantive relevance problem too. These paragraphs detail Edom's reports of illegal conduct at the Simmons Boys and Girls Club. Edom reported that Club employees "were having sex in the closets with each other and with children," (Doc. 13 at ¶ 32), convicted felons walked freely in the Club, (*Id.* at ¶ 33), and a registered sex offender worked with children, (*Id.* at ¶ 38). While deeply troubling, none of these comments are relevant to a § 1981 retaliation claim, which is limited to reports about *race* discrimination. *See Tucker v. Talladega City Schools*, 171 F. App'x 289, 295 (11th Cir. 2006) ("[Section] 1981, unlike Title VII, is

directed exclusively toward racial discrimination . . . ."). While FCRA is not so narrow, it too has a limited scope. It only applies to a person who opposed an "employment practice" that is unlawful "under this section." § 760.10(7), Fla. Stat. The FCRA is almost exclusively addressed to claims of race or sex discrimination in employment. While Edom's complaints about the Club might suggest that he reported sex crimes, he does not allege that he reported sex or race discrimination by the HCSO in its employment decisions. Simply put, these paragraphs are irrelevant to Edom's retaliation claims.[16] But they are the only paragraphs he cites as "statutorily protected expression" in opposition to the motion to dismiss. (Doc. 23 at 16.)

Nonetheless, there is one report that qualifies under § 1981 and FCRA: Edom's complaint of race and sex discrimination to the EEOC in November of 2016 over the HCSO's handling of the Scantlebury investigation.[17] (Doc. 13 at ¶ 7.) With that qualifying act, and an adverse employment action in the form of his constructive termination, Edom then must establish a causal connection between the two.

---

[16] It is similarly irrelevant that Chronister threatened to "write [Edom] up if he kept reporting incidents related to the Club." (Doc. 13 at ¶ 35.) If Chronister followed through this would be retaliation colloquially speaking, but it would not state a claim for retaliation under § 1981 or FCRA because Edom was not reporting race or sex discrimination in the HCSO's employment practices.

[17] Once again, Edom does not reallege these paragraphs in Count VII or Count VIII. Nevertheless, the Court includes discussion of them here to show that—even without Edom's intentional or unintentional omission—no facts in the Amended Complaint ultimately suffice for Edom to state a claim under Count VII or Count VIII.

Absent direct evidence of a retaliatory motive, the most common way to establish causation is through "close temporal proximity." *Thomas*, 506 F.3d at 1364. Edom filed his charge with the EEOC in November of 2016. He was constructively terminated in July of the following year. Normally a months-long delay would defeat a causal link. *See id.* at 1364 (reasoning that a three-month period between a complaint and termination was too long). Mere "temporal proximity, without more, must be 'very close.'" *Id.* (quoting *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001)). But Edom has a bit more. At his hearing before the Discipline Review Board, Edom alleges that Attorney Thea Clark "scolded" Edom for "filing a race discrimination charge with the EEOC." (Doc. 13 at ¶ 80.) Edom was constructively terminated less than a week later. (*Id.* at 90.) Showing that a "decision maker was aware of the protected conduct at the time of adverse employment action" usually suffices to "show the two things were not entirely unrelated." *Brungary v. BellSouth Telecomm., Inc.*, 231 F.3d 791, 799 (11th Cir. 2000). Of course, Clark may not have been the decisionmaker; Edom's Amended Complaint's allegations reveal she probably was not. But she allegedly knew about the EEOC charge and mentioned it to high ranking HCSO officials just days before Edom's constructive termination. That allegation is "sufficient circumstantial evidence" to make a causal connection plausible between Edom's EEOC charge and his constructive termination. *Id.* at 799; *see Olmsted v. Taco Bell Corp.*, 141 F.3d 1457, 1460 (11th Cir. 1998) ("[A] plaintiff merely has to

prove that the protected activity and the negative employment action are not completely unrelated." (quotation omitted)).

Construing all the factual allegations in the Amended Complaint as true, Edom has satisfied the minimum requirements of a retaliation claim: he engaged in protected speech by filing a complaint with the EEOC over HCSO's race and sex discrimination; he suffered an adverse employment in the form of his constructive termination; and he plausibly alleged that the two events "were not wholly unrelated" by showing that high ranking HCSO officials were aware of his EEOC complaint just days before his constructive termination. *Goldsmith*, 513 F.3d at 1278 (quotation omitted); *see Twombly*, 550 U.S. at 570 (noting that a plaintiff need only "nudge[ his] claims across the line from conceivable to plausible").

Even though Edom manages to state a claim for retaliation under FCRA and § 1981, two familiar obstacles block his claims: FCRA exhaustion requirements and § 1983's requirements for municipal liability.

First, Edom cannot maintain a FCRA retaliation claim because he has not made timely use of his administrative remedies. FCRA requires a plaintiff to file a charge of discriminatory retaliation with either the EEOC or FCHR "within 365 days of the alleged violation." § 760.11(1), Fla. Stat.; *see Shedrick*, 941 F. Supp. 2d at 1365–66. The retaliatory act the Amended Complaint presents and the one for which Edom has stated a claim is his constructive termination in July of 2017. Edom must have filed a charge with

either the EEOC or FCHR within 365 days of his termination to preserve his claim. Edom has not alleged that he filed any charge other than his EEOC charge in November of 2016.[18] Thus, Edom has either failed to exhaust his administrative remedies (and would be time barred from pursuing them), or he has failed to state a claim by omitting conditions precedent to suit from his Amended Complaint. Either way, the Court dismisses Count VII.

As to the second obstacle, Edom's § 1981 retaliation claim fails because he has not established municipal liability under § 1983. As explained above, Edom fails to establish municipal liability for his First Amendment retaliation claim. For similar reasons, he also has not done so for retaliation under § 1981, which—unlike the First Amendment—is limited to complaints about race discrimination. *See Tucker*, 171 F. App'x at 295.

Instead, Edom alleges that he suffered wrongs from individual employees, not the municipality itself. Chronister initiated the Internal Affairs investigation into the Scantlebury incident. (Doc. 13 at ¶ 57.) Portalatin manipulated evidence and relied on "unverified statements to incriminate" Edom. (*Id.* at ¶ 54.) The six members of the Discipline Review Board entered a "biased" dismissal recommendation. (*Id.* at ¶¶ 81–82.) And Chronister pressured the benefits officer to force Edom to resign. (*Id.* at ¶ 91.) But

---

[18] As explained above, the subject matter of Edom's EEOC charge does not sufficiently relate to his later constructive termination for the continuing violations doctrine to apply. *See Shedrick*, 941 F. Supp. 2d at 1363–64 (noting that retaliation claims only reasonably grow out of an EEOC charge levying discrimination when they are "inextricably intertwined" (citing *Gregory*, 335 F.3d at 1280)).

"a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents." *Monell*, 436 U.S. at 694.

Again, Edom attempts to "treat[] a [few] subordinate employee[s'] decisions as if [they] were a reflection of municipal policy." *Praprotnik*, 485 U.S. at 130. Edom fails to allege either an official policy accepted by a final policymaker or "a series of decisions by subordinate official[s that] manifested a 'custom or usage' of which the supervisor must have been aware." *Id.*; *see Gilroy*, 843 F. App'x at 198 (A "custom" is a "widespread practice that, although [unofficial], is so permanent and well settled as to constitute a custom or usage with the force of law."). Instead, the Amended Complaint states that Chief Docobo—the highest HCSO official involved in Edom's constructive termination—consistently rejected the unlawful acts of his subordinates. Accordingly, no theory of municipal liability attaches to the HCSO and Edom has failed to plausibly allege a claim of retaliation under § 1981. The Court, accordingly, dismisses Count VIII.

### iv. Disability Discrimination

In Count III, Edom brings a claim of disability discrimination under Chapter 760, Florida Statutes. (Doc. 13 at ¶¶ 115–22.) But Edom must file a complaint with the Florida Commission on Human Relations or the EEOC before bringing a disability claim. *See* § 760.11(1), Fla. Stat. ("Any person aggrieved by a violation of [this Chapter] may file a complaint with the commission within 365 of the alleged violation. . . ."); § 760.07, Fla.

Stat. (providing that a civil suit "may only be initiated after the plaintiff has exhausted his or her administrative remedy"); *Jones v. Bank of Am.*, 985 F. Supp. 2d 1320, 1324–25 (M.D. Fla. 2013) (Chappell, J.).

Since Edom "concede[d] that he did not exhaust his administrative remedies for a claim of disability discrimination," (Doc. 23 at 18), this Court dismisses Count III. *See Jones*, 985 F. Supp. 2d at 1325 ("A motion to dismiss for failure to exhaust administrative remedies is treated as a Rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief may be granted.").

## V.    CONCLUSION

For the foregoing reasons, the Court concludes that Edom met the pleading requirements for Counts II and VI. But the Court dismisses Counts I, III, IV, V, VII, and VIII without prejudice for failure to state a claim upon which relief may be granted.

Accordingly, the following is **ORDERED**:

(1) Defendant Chad Chronister's Motion to Dismiss in his Individual Capacity (Doc. 16) is **GRANTED**. The Court **DISMISSES** Count V **without prejudice**.

(2) Defendant Chad Chronister's Motion to Dismiss in his Official Capacity (Doc. 17) is DENIED-IN-PART and GRANTED-IN-PART.

a.  The Court **GRANTS** Chronister's Motion to Dismiss as to Counts I, III, IV, VII, and VIII. The Court **DISMISSES** Counts I, III, IV, VII, and VIII **without prejudice**.

b.  The Court DENIES Chronister's Motion to Dismiss as to Counts II and VI.

**(3)** The parties are directed to file a joint notice of agreed upon deadlines for remaining discovery and propose a timeline for dispositive motions and trial-related motions. That joint notice is due no later than **September 24, 2021**.

**ORDERED** in Tampa, Florida, on September 17, 2021.

Kathryn Kimball Mizelle
United States District Judge