# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# TAMPA DIVISION

WILLIE EDOM, JR.,

      Plaintiff,

v.                                   Case No: 8:20-cv-1624-KKM-AEP

CHAD CHRONISTER in
his official capacity as SHERIFF
of HILLSBOROUGH COUNTY,

      Defendant.

_____

## <u>ORDER</u>

      Chad Chronister, acting in his capacity as Sheriff of Hillsborough County, moves for summary judgment on Willie Edom's claims that the Hillsborough County Sheriff's Office (HCSO) discriminated against him based on race in violation of 42 U.S.C. § 1981 and the Fourteenth Amendment's Equal Protection Clause. HCSO[1] argues that Edom presented insufficient circumstantial evidence to support a charge of intentional discrimination. The Court agrees.

---

[1] Edom sues Sheriff Chronister in his official capacity as Sheriff of Hillsborough County, which is simply "another way of pleading an action against an entity of which an officer is an agent." *Kentucky v. Graham*, 473 U.S. 159, 165 (1985) (quotation omitted). Since the suit is really against HCSO, the Court refers to Defendant as HCSO.

## I.   BACKGROUND[2]

Edom, an African American male, began working for HCSO in 1994 as a deputy sheriff. (Doc. 67 at 20–22.) Between 2004 and 2006, Corporal Anthony Miller, a white HCSO employee, made racist jokes and comments toward Edom or in Edom's presence. (*Id.* at 93–103.) In 2004, Edom reported Miller to Internal Affairs, (Doc. 67-17 at 12), but nothing came of it, (Doc. 67 at 99). Miller was later forced out of the Sheriff's Office because he cursed at a superior and "had a lot of complaints" against him. (*Id.* at 105–06.)

By 2013, Edom had worked various assignments, (Doc. 83-6 at 2), and earned a master deputy designation, (Doc. 67 at 166). HCSO assigned Edom to work at a Boys & Girls Club in the Nuccio Recreation Center when the Club opened in 2013. (Doc. 79 at 2.) Edom, who proposed the idea for the Club, (Doc. 67 at 148–49), was responsible for security, as well as for teaching and mentoring the children, (Doc. 79 at 2). The Club itself was responsible for its day-to-day management and activities. (*Id.* at 2.)

Edom observed various misconduct at the Club. Particularly concerning was sexual misconduct between the son of a staff member and a minor child participant. (Doc. 67 at 175–76.) Edom also noticed staff stealing donations intended for the children. (Doc. 83-6 at 3.) Edom reported the misconduct to the Club Director C.J. Simmons, who instructed

---

[2] The Court recounts the undisputed facts as contained in the record. To the extent facts are disputed or capable of multiple inferences, the Court construes the record in favor of the nonmovant, Plaintiff. *See Sconiers v. Lockhart*, 946 F.3d 1256, 1262 (11th Cir. 2020).

Edom not to "get involved in it." (Doc. 67 at 177.) Undeterred, Edom raised complaints with his superiors, including Corporal Benjamin Kenny, then-Major Chronister, and Captain Thomas St. John. (*Id.* at 177–78; Doc. 83-6 at 3.) They instructed Edom that he had no authority over the Club's operation and threatened to write Edom up if he continued bringing similar complaints. (Doc. 67 at 177–78.) They further directed Edom to report all complaints about the Club to Simmons or Delilah Solomon, another manager at the Club. (*Id.*; Doc. 83-6 at 3.) Edom "kept telling them what was going on in the club," but "they wouldn't do anything." (Doc. 67 at 179.)

Despite his complaints about the Club's operations, Edom was still working full time at the Club in 2016 when the Club appointed Alexxzondra Ford as a new director. (Doc. 79 at 2.)

On August 30, 2016, a Club staff member named Daniela Scantlebury initiated a conversation with Edom while they were alone in the Club before it opened for the day. (Doc. 67 at 238–40.) Scantlebury began discussing her past romantic relationships, with a particular focus on her sexual activity. (*Id.* at 240.) She continued talking on these subjects for approximately twenty minutes. (Doc. 83-3 at 22.) Edom listened. (*Id.* at 21.) He did not walk away or stop the conversation. (*Id.*) Towards the end of the conversation but before returning to his work, Edom asked "are you trying to make me have fantasies about you or something?" (*Id.* at 14.) Edom thought that this comment "upset" Scantlebury by

3

"the look on her face." (Doc. 67 at 254.) Just prior to this conversation, "Scantlebury hugged [Edom]," but he "did not hug her back." (*Id.* at 262; Doc. 83-6 at 3–4.)

As was his practice, Edom arranged lunch for the Club staff members. (Doc. 67 at 240–41.) Later that day, Scantlebury texted Edom to cancel her lunch order. (*Id.* at 241.) A screenshot from Scantlebury's phone shows that Edom responded by calling Scantlebury "beautiful" in place of her name. (Doc. 67-8 at 58.) During his deposition, Edom denies that he said "beautiful" and asserts that the text is not accurate. (Doc. 67 at 421–23.) Edom also explained that he called all the young girls at the Club "beautiful" and that he did not know Scantlebury's name. (Doc. 83-3 at 10.) The Court accepts Edom's version of the facts for purposes of this motion. Nevertheless, the screenshot and Edom's (at least apparent) admission to calling Scantlebury beautiful during two disciplinary hearings informs whether HCSO believed Edom's behavior was inappropriate.

This was the second time Scantlebury initiated a sexually inappropriate conversation with Edom. (Doc. 83-6 at 3.) On both occasions, Edom listened, but did not solicit information or participate in the conversation. (Doc. 67 at 261.) On both occasions, he reported the conversation to Ford. Ford took no action, except to express romantic interest in Scantlebury. (Doc. 83-6; Doc. 67 at 255.) Edom then reported both Scantlebury and Ford to Solomon. Solomon also did nothing to stop further "inappropriate sexual commentary." (Doc. 83-6 at 3.)

4

Later that same day, Edom learned that he was being transferred from the Club to a new assignment. (Doc. 67 at 242, 267.) He was not told the reason for his transfer at the time. (*Id.* at 242–43.) He later learned that Scantlebury reported the conversation with Edom to her supervisor. (Doc. 79 at 2.) Her version of the story, which Edom says is a lie, (Doc. 67 at 252–54), is that Edom started talking about graphic sexual acts and later gave her two prolonged hugs, (Doc. 67-8 at 41–42). Chronister heard about Scantlebury's complaint and referred it to Internal Affairs, which began an investigation. (Doc. 67 at 243–44, 248; Doc. 79 at 2.).

Internal Affairs (IA) conducted a full review. Samuel Portalatin, the investigator, interviewed Scantlebury, Ford, Solomon, Edom, and six other Club employees. (Doc. 79 at 3.) IA completed its investigation on October 3, 2016. (*Id.*) It sustained the allegations and informed Edom that the command staff would review his case. (*Id.*)

On November 16, 2016, following the IA investigation, Edom filed a charge with the Equal Employment Opportunity Commission (EEOC) and the Florida Commission on Human Relations (FCHR), alleging that HCSO was treating him differently because of his race and sex. (Doc. 83-6 at 4; Doc. 67-23.) HCSO's chief legal counsel Thea Clark filed a position statement denying the allegations. (Doc. 83-14.)

As Edom's division commander, Major Scott Wellinger was "responsible for reviewing the investigation and providing a disciplinary recommendation." (Doc. 79 at 3.)

On November 21, 2016, Wellinger held a pre-disciplinary hearing. (Doc. 83-6 at 5.) Edom admitted to having a conversation with Ford about Edom's wife not having sex with him and to listening to Scantlebury's conversation without stopping it. (Doc. 67-8 at 18–19.) Edom also agreed with Wellinger that these conversations were not appropriate "in that setting," with "civilian staff" while Edom was "on duty" and in uniform. (*Id.*)

After reviewing the evidence and hearing from Edom, Wellinger confirmed the findings of the IA investigation. (Doc. 83-6 at 5; Doc. 83-12 at 37.) He found that Edom sexually harassed Scantlebury, violating HCSO rule 4.2.09, which prohibits sexual harassment, and was not truthful, violating rule 4.8.01. (Doc. 79 at 3.) He also added a charge of conduct unbecoming a sheriff's deputy, which is a violation of rule 4.9.09. (Doc. 83-6 at 5; Doc. 79 at 3.) He recommended that HCSO fire Edom. (Doc. 79 at 3.)

On the same day as Edom's hearing with Wellinger, November 21, 2016, Edom accidentally discharged his firearm while stowing it in a rack in his patrol car. (Doc. 67 at 337–39.) As required in HCSO rule 551.00, (Doc. 67-22 at 11), Edom reported the discharge, (Doc. 67 at 339–40). After an inspection from the "shoot team," (*id.* at 340), Edom received a two-day suspension that was later modified to a one-day suspension, (*id.* at 340–41; Doc. 83-6 at 7). A one-day suspension was the average number of days an employee was suspended for an accidental discharge processed under rule 4.6.06. (Doc. 67-20.) Edom alleges that it is "[c]ommon knowledge" that white officers were treated more

favorably for accidental discharges. (Doc. 67 at 341.) That said, of the twenty-one deputies suspended for an accidental discharge between 2010 and 2020, thirteen of them were white. (Doc. 77-1; Doc. 77 at 2.)

Edom appealed Wellinger's decision, requesting a Complaint Review Board (CRB). (Doc. 67 at 285; Doc. 83-6 at 5.) A CRB is formed of five people. Edom picked two members, HCSO picked two members, and the four members picked the final member. (Doc. 79 at 4.) The CRB held a hearing on November 28, 2016, to consider the evidence and hear testimony. (*Id.*; Doc. 83-2 at 2.) At the hearing, Edom "explain[ed] his narrative of the case" and "answer[ed] questions from Board members." (Doc. 67-11 at 1.) "After lengthy discussion, review of the investigation, and careful consideration," the CRB unanimously sustained the sexual harassment allegations. (*Id.*; Doc. 67 at 285–86.) Four of the five members thought "mitigating circumstances" counseled against of termination. (Doc. 67-11 at 1; Doc. 79 at 4.) They instead proposed a 30-day suspension, retraining in ethics and sexual harassment, and loss of his master deputy designation. (Doc. 83-6 at 5; Doc. 67-11 at 1.)

Edom appealed the CRB decision. (Doc. 83-6 at 5.) Just after the CRB released its decision, Edom had surgery to address his prostate cancer. (Doc. 67 at 294–95.) He also had "major back surgery." (*Id.* at 296.) Following the surgeries, Edom took medical leave from December 27, 2016, through May 2017. (*Id.* at 294–95.)

Upon his return to work in May 2017, Edom's physical condition required a light-duty assignment. (*Id.* at 298–300.) HCSO assigned Edom to the communications center, where he wrote reports. (*Id.* at 299.) Because Edom was on light duty, HCSO removed Edom's master deputy status and the accompanying pay raise. (Doc. 83-6 at 6; Doc. 67-15 at 5.) Edom acknowledges that this practice was required, (Doc. 67 at 302), but he claims that it was not enforced against white deputies assigned to the communications center, (*id.* at 303; Doc. 83-6 at 6).

On July 7, 2017, the Discipline Review Board (DRB) held a hearing on Edom's case. (Doc. 79 at 4.) The DRB consisted of all the colonels—including Chronister—and HCSO's chief legal counsel, Clark. (*Id.*; Doc. 67 at 312–14.) During the hearing, Edom admitted that he "shouldn't have let [Scantlebury's conversation] go on" and that he "didn't walk away." (Doc. 83-3 at 21, 23.) He also admitted to talking with Ford about Edom's wife not having sex with him and that it was not appropriate in that setting. (*Id.* at 12, 19.) Finally, Edom admitted that he asked Scantlebury if she was "trying to make [him] have fantasies about [her]," (*id.* at 20–21), and that he called her "beautiful," (*id.* at 10).

The DRB concluded that there was insufficient evidence for an allegation of untruthfulness. (Doc. 79 at 4.) But based on Edom's admissions and the rest of the record, the DRB sustained the charges for sexual harassment and conduct unbecoming. (Doc. 83-

6 at 6.) Finally, the DRB agreed with Wellinger's recommendation to terminate Edom. (Doc. 79 at 4.)

On July 12, 2017, Edom tried to retire because he was in considerable pain from his prior surgeries. (Doc. 67 at 326–27, 331; Doc. 79 at 5.) However, the benefits officer on duty refused to accept Edom's retirement, telling him that he did not have enough service time and that Chronister had told her that Edom's retirement would not be accepted. (Doc. 67 at 326–27.) After hearing that he would not be allowed to retire, Edom felt "forced" to resign. (*Id.* at 327–28; Doc. 83-6 at 6.) And so he did.

Edom's resignation was initially processed as a "green separation," meaning that Edom resigned on good terms. This is because Deputy Chief Docobo accepted Edom's resignation. (Doc. 83-6 at 6.) Later it was changed to a "red separation" to indicate that Edom resigned while under investigation or disciplinary measures.[3] (*Id.* at 6.)

Edom sued Chronister in his individual and official capacity on June 21, 2020. (Doc. 1.) The Court dismissed the claims against Chronister in his individual capacity, leaving only claims for racial discrimination under 42 U.S.C. § 1981 and the Fourteenth Amendment against Chronister in his official capacity. (Doc. 61.) Following discovery,

---

[3] Although Edom and HSCO recount the events after the DRB decision to recommend termination, Edom does not apply these facts to his claims. For example, he does not argue that the actions of the benefits officer, the forced resignation, or the "red separation" were racially motivated or show pretext for race discrimination. Since Edom has not argued these matters, the Court does not further address them. *See Resol. Tr. Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) ("[The] onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned.").

HCSO moved for summary judgment. (Doc. 66.) Edom responded in opposition. (Doc. 82.) And HCSO replied. (Doc. 84.)

## II.   LEGAL STANDARD

Summary judgment is appropriate if there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed R. Civ. P. 56(a). A fact is material if it might affect the outcome of the suit. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

A moving party is entitled to summary judgment when the nonmoving party "fail[s] to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotext Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant bears the initial burden of informing the court of the basis for its motion and identifying those parts of the record that show an absence of a genuine issue of fact. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991).

When that burden is met, the burden shifts to the nonmovant to prove that there is a genuine issue of fact that precludes summary judgment. *Id.* The nonmoving party must "go beyond the pleadings" and point to evidence of a real issue for trial. *Celotex*, 477 U.S. at 324 (quotation omitted). "A mere 'scintilla' of evidence" does not suffice; "there must be enough of a showing that the jury could reasonably find for [the nonmovant]." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (quotation omitted). In reviewing the

evidence, the Court draws all legitimate inferences in the nonmoving party's favor. *See Sconiers v. Lockhart*, 946 F.3d 1256, 1263 (11th Cir. 2020).

## III.   ANALYSIS

The Equal Protection Clause of the Fourteenth Amendment and 42 U.S.C. § 1981 prohibit race discrimination. To survive summary judgment, a plaintiff alleging discrimination under the Fourteenth Amendment or § 1981 must present sufficient evidence to permit a jury to return a verdict in his favor. *See Lewis v. City of Union City*, 918 F.3d 1213, 1217 (11th Cir. 2019) (en banc) (explaining that the analysis for § 1981 and the Equal Protection Clause is the same). A plaintiff may do that in one of three ways. The first is to present direct evidence of discriminatory intent. *See Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 921–22 (11th Cir. 2018) (explaining that "only the most blatant remarks" count as direct evidence of discrimination (quotation omitted)). Edom does not argue that he presented direct evidence of discrimination.

The remaining methods—and the ones Edom tries—rely on circumstantial evidence. The second is the burden-shifting framework created in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). And the third is to present a convincing mosaic of circumstances that "creates a triable issue concerning the employer's discriminatory intent." *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011).

HCSO insists that it is entitled to summary judgment because Edom fails to carry his burden under either approach. HCSO submits that Edom cannot satisfy *McDonnell Douglas* because he has not alleged proper comparators and cannot rebut its non-discriminatory reason for disciplining Edom. So too, Edom's efforts to present a convincing mosaic of intentional discrimination fail, HCSO argues, because Edom has insufficient evidence from which a reasonable jury could infer intentional race discrimination.

## A. *McDonnell Douglas* Framework

A plaintiff proceeding under *McDonnell Douglas* bears the initial burden of establishing a prima facie case of discrimination. *See Lewis*, 918 F.3d at 1220. If the plaintiff makes that showing, the burden shifts to the defendant to articulate a legitimate nondiscriminatory reason for its actions. If the defendant does so, the plaintiff must demonstrate that the proffered reason was merely a pretext for discrimination.

### 1. Prima Facie Case

To make out a prima facie case under *McDonnell Douglas*, the plaintiff must show that (1) he belonged to a protected class, (2) he suffered an adverse employment action, (3) he was qualified for the job, and (4) that the employer treated similarly situated employees outside the protected class more favorably. *See id.* at 1220–21.

HCSO contests one element of Edom's prima facie showing. HCSO argues that Edom does not have evidence that HCSO treated similarly situated employees more favorably than it did Edom. (Doc. 66 at 14–21.) In response, Edom supplies three groups of potential comparators. One for the sexual harassment charge, one for the weapon discharge, and one for his loss of master deputy status. No comparator is sufficiently similar to Edom to carry his burden under *McDonnell Douglas*.

A valid comparator is "similarly situated in all material respects." *Lewis*, 918 F.3d at 1218. "Ordinarily," a similarly situated comparator (1) "engaged in the same basic conduct"; (2) was subject to the same policy, guideline, or rule; (3) was under the same supervisor; and (4) "share[s] the plaintiff's employment or disciplinary history." *Id.* at 1227–28. The analysis "will turn not on formal labels, but rather on substantive likeness." *Id.* at 1228. "The burden is on [the plaintiff] 'to show a similarity between [his] conduct and that of white employees who were treated differently and not on [the defendant] to disprove their similarity.'" *Jones v. Gerwens*, 874 F.2d 1534, 1541 (11th Cir. 1989) (quotation omitted) (second and third alternations in original).

### i.  Proposed Comparators for Sexual Harassment Charge

At the conclusion of the Scantlebury investigation, HCSO found that Edom violated its rules against sexual harassment and conduct unbecoming an officer. It decided that Edom should be terminated. Edom identifies six HCSO employees that he alleges are

13

similarly situated to himself who were treated more favorably than he was. (Doc. 82 at 7–8.) He is mistaken.

Five of the six are easily disqualified as appropriate comparators. Edom submits that Charlie Keene, Monica Docobo, Nicole Morgan, David Schram, and Scott Wellinger are similarly situated because they engaged in extramarital affairs, all with fellow employees, some with subordinates, and some while on duty. (*Id.*) None of these individuals are black and none of them were investigated or disciplined for their actions. (*Id.*)

They are not similarly situated because they did not engage in the "same basic conduct" that Edom did. *Lewis*, 918 F.3d at 1227. A consensual affair is not the same conduct as sexual harassment. *See id.* at 1230 (reasoning that a permanent condition was not similar to a remediable condition). Nor is there a "substantive likeness[]" between those acts. *Id.* at 1228. They also implicate different HCSO rules. *See Lathem v. Dep't of Child. & Youth Servs.*, 172 F.3d 786, 793 (11th Cir. 1999) (reasoning employees are not similarly situated if they violate different workplace rules or policies); *Earle v. Birmingham Bd. of Educ.*, 843 F. App'x 164, 167 (11th Cir. 2021) (per curiam) (employees were not similar because of "the different policies they were subject to"). Sexual harassment violates HCSO rule 211.00. (Doc. 67-8 at 33.) An affair with a coworker, in contrast, is "not prohibited," but it may violate rule 571.00 if the individuals remain in the same chain of command. (Doc. 72-1.) The latter, which was implemented over a year after Edom resigned, is

14

designed to avoid "the appearance of impropriety or favoritism." (*Id.* at 1.) Meanwhile, the rule against sexual harassment is intended to prevent personnel from "us[ing] their official position to harass, threaten, or coerce any person." (Doc. 67-8 at 33.)

In sum, sexual harassment and a workplace affair are materially different acts that violate different rules animated by different purposes.[4] "Accordingly, [any] disparate treatment was not discrimination—it involved treating different things differently, not the same things differently." *Earle*, 843 F. App'x at 167; *see Lathem*, 172 F.3d at 793 ("If two employees are not 'similarly situated,' the different application of workplace rules does not constitute illegal discrimination.").

The sixth potential comparator is closer but also falls short of the "similarly situated" standard. Shawn Napolitano, a white male, was accused of inappropriately touching a female recruit during training and using derogatory stereotypes about female officers. (Doc. 77 at 1–2.) IA investigated the allegations and determined that the touching did not constitute sexual harassment because it occurred during an instruction on how to search suspects and was not sexual in nature. (*Id.* at 2.) The investigation sustained a charge for conduct unbecoming. (*Id.*) As a result, Napolitano was demoted from sergeant to deputy. (Doc 66-2 at 4.)

---

[4] Edom also points out that Keene was arrested for Driving Under the Influence while in a sheriff's department car. (Doc. 72 at 9–10, 31–32.) Edom does not explain how a DUI is similar conduct to sexual harassment.

15

There are three critical differences between Napolitano and Edom. First, their conduct, while processed under the same rules, is meaningfully different. Napolitano's conduct was towards a fellow HCSO employee at HCSO facilities, (Doc. 76-6); Edom was charged with sexually harassing a civilian in a civilian environment. And HCSO focused on these aspects of Edom's alleged offense in reaching its decision. For example, during the DRB hearing, Clark emphasized that Scantlebury was "a young girl," that it occurred "in a Boys and Girls Club setting," that Edom was "in uniform" and that he was acting as "a deputy sheriff" at the Club. (Doc. 83-3 at 22.) Chronister made similar comments. (*Id.* at 12–13.) So did Wellinger during his hearing with Edom. (Doc. 67-8 at 18.) Thus, the conduct is different enough that a decisionmaker would be justified in treating the acts differently. *See Knox v. Roper Pump Co.*, 957 F.3d 1237, 1247 (11th Cir. 2020) (reasoning that a plaintiff and a proposed comparator were not sufficiently similar, even though both engaged in domestic violence, because one struck a co-worker and the other did not).[5]

Second, Napolitano and Edom do not "share the [same] employment . . . history." *Lewis*, 918 F.3d at 1228. At the time of the DRB's decision, Edom was a deputy—an entry

---

[5] In *Knox*, the employer treated the employee accused of domestic violence against an employee more harshly than the employee accused of similar acts against a non-employee. *Knox*, 957 F.3d at 1247. The opposite is the case here; HCSO disciplined Edom more harshly for allegedly harassing a non-employee than it did Napolitano for harassing employees. The discrepancy makes sense. An ordinary employer—like the one in *Knox*—is primarily responsible for its own employees; a sheriff's office—like the one here—is primarily responsible for the public.

16

level position; Napolitano was a sergeant. (Doc. 76-6; Doc. 66-2 at 4.) The difference is significant because Edom could not be demoted, but Napolitano could. So too, Napolitano's status as a supervisor and a higher-paid officer differentiates him from Edom. *See Earle*, 843 F. App'x at 167 (reasoning that a comparator was not similar because of years as a higher paid officer than the plaintiff); *Shell v. AT&T Corp.*, No. 20-12533, 2021 WL 3929916, at *7 (11th Cir. Sept. 2, 2021) (concluding that "a nonmanagement employee with no supervisory responsibilities" was not similar to a managerial employee).

Third, Napolitano and Edom were not disciplined by the same supervisors. *See Lewis*, 918 F.3d at 1227; *Jenkins v. Nell*, 26 F.4th 1243, 1249 (11th Cir. 2022) (explaining that proper comparators usually "have the same supervisor(s)"). The investigation into Napolitano's misconduct came more than three years after Edom's conversations with Scantlebury. (Doc. 76-6 at 1.) By that time, personnel changes resulted in a different set of decisionmakers for Napolitano than Edom. For example, the division commander who reviewed the charges against Napolitano was Major Robert Rodriguez, not Major Wellinger. (Doc. 77 at 1.) And the Chief Deputy who accepted Napolitano's demotion was Donna Lusczynski, not Docobo. (Doc. 76-6.) "[D]ifferences in treatment by different supervisors or decision makers can seldom be the basis for a viable claim of discrimination." *Silvera v. Orange Cnty. Sch. Bd.*, 244 F.3d 1253, 1261 n.5 (11th Cir. 2001); *Knox*, 957 F.3d at 1248 ("While not dispositive, the fact that different supervisors were involved is

still another meaningful distinction."). This is so because "supervisors may have different management styles" that may "account for disparate disciplinary treatment that employees experience." *Jones v. Bessemer Carraway Med. Ctr.*, 137 F.3d 1306, 1312 n.7 (11th Cir. 1998), *partially superseded on other grounds*, 151 F.3d 1321. Given the difference in decisionmakers, employment history, and conduct, no inference of intentional discrimination arises from the different outcomes in Edom's and Napolitano's cases.

Since none of these individuals are similarly situated to Edom in all material respects, Edom cannot rely on HCSO's different treatment of them to support his prima facie case for discrimination. This is so because discrimination is the act of "treating *like* cases differently." *NLRB v. Collier*, 553 F.2d 425, 428 (5th Cir. 1977) (emphasis added). No inference of discrimination arises from "treating *different* things differently." *Lewis*, 918 F.3d at 1225.

### ii.  Proposed Comparators for Weapon Discharge

HCSO initially suspended Edom for two days after he accidentally discharged his weapon in a patrol car. The suspension was later reduced to one day. Edom claims that Chronister and Lusczynski, who are both white, accidentally discharged their firearms but were not disciplined. (Doc. 82 at 8.) Edom believes Chronister's discharge was in 2014 or 2015, but supplies no date for Lusczynski's discharge. (Doc. 67 at 340–43.)

There are three problems with these proposed comparisons. First, Chronister and Lusczynski have different employment histories than Edom does. Chronister was a major (or possibly a colonel) at the time of his discharge, (Doc. 67 at 246), and Lusczynski was a colonel at the time of Edom's termination and would later rise to chief deputy, (*id.* at 312, 350; Doc. 83-3); Edom was a deputy. This difference strongly suggests that they are not proper comparators. *See Earle*, 843 F. App'x at 167. Second, Edom identifies no evidence that the relevant HCSO decisionmakers were aware of Chronister's or Lusczynski's discharge. A comparison is "inapposite" without evidence that the decisionmaker "knew of [the] transgressions" and "consciously overlooked" them. *Gerwens*, 874 F.2d at 1541–42.[6]

Finally, Edom fails to carry his burden of proving that the comparators are similar because he supplies almost no information on these events. *See id.* at 1541; *Blackmon v. Lee Mem'l Health Sys.*, No. 2:19-cv-625, 2021 WL 808848, at *8 (M.D. Fla. Mar. 3, 2021) (Steele, J.) (faulting plaintiff for "not present[ing] any evidence that [a comparator] shared Plaintiff's employment or disciplinary history"). Without additional information on when these discharges occurred, the circumstances surrounding the discharges, and what decisionmakers—if any—knew of the discharges, the Court cannot find that Edom's proposed comparators are "sufficiently similar, in an objective sense, that they cannot

---

[6] Based on Edom's deposition, it seems he learned of Chronister's accidental discharge only because he "was fishing buddies" with an eyewitness. (Doc. 67 at 342.)

reasonably be distinguished." *Lewis*, 918 F.3d at 1228 (internal quotation marks omitted) (quoting *Young v. United Parcel Serv., Inc.*, 575 U.S. 206, 231 (2015)).

### iii.   Proposed Comparators for Loss of Master Deputy Status

After Edom returned from medical leave, he was assigned to a light duty station due to his physical inability to return to full duty. HCSO rule 200.05 provides that an employee who is on light duty for more than fourteen working days is ineligible for master deputy status. (Doc. 67-15 at 5.) Consistent with this rule, Edom's master deputy status was revoked during his time on light duty.

Edom argues that white employees did not lose their master deputy status. (Doc. 82 at 17; Doc. 83-6 at 5–6.) But his response to the motion for summary judgment does not identify a single comparator by name or by description. This bare assertion is insufficient to carry Edom's burden to establish sufficiently similar comparators. *See Lewis*, 918 F.3d at 1229–30 (explaining that the plaintiff "must demonstrate" that the comparators are similar and that he may not use a "broad-brush summary [to] gloss[] over critical differences").

### iv.   Conclusion to Prima Facie Case

All told, Edom fails to identify sufficiently similar white employees who HCSO treated more favorably than himself. That failure "preclude[s] the establishment of a prima facie case" under *McDonnell Douglas*. *Earle*, 843 F. App'x at 166; *see Lewis*, 918 F.3d at

1228 (explaining that summary judgment is "appropriate" when "the comparators are simply too dissimilar to permit a valid inference that invidious discrimination is afoot." (emphasis omitted)).

### 2. Nondiscriminatory Reason

If Edom had succeeded in making out a prima facie case of race discrimination, the burden would shift to HCSO to articulate a "legitimate, nondiscriminatory reason" for treating Edom as it did. *Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981) (quoting *McDonnell Douglas*, 411 U.S. at 802).

HCSO has such a reason. HCSO claims that it acted on the honest belief that Edom reacted inappropriately to Scantlebury's comments, violating HCSO rules on sexual harassment and the conduct becoming an officer. (Doc. 66 at 21.) HCSO reached this decision after interviewing witnesses, holding two hearings, and conducting multiple, independent reviews of the evidence. Evidence of rule violations is a valid, nondiscriminatory reason to discipline an employee. *See Gerwens*, 874 F.2d at 1540 (explaining that a showing that the employer "honestly believed the employee committed [a] violation" rebuts any presumption from the prima facie case). Accordingly, HCSO has met its burden.

### 3.   Pretext for Intentional Race Discrimination

Since HCSO articulates a nondiscriminatory reason for its actions, Edom—had he carried his burden on the prima facie case—would have to show that the proffered reason is a mere pretext for intentional race discrimination. A plaintiff "may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Burdine*, 450 U.S. at 256 (citing *McDonnell Douglas*, 411 U.S. at 804–05). A reason is not pretext for discrimination "unless it is show[s] both that the reason was false, and that discrimination was the real reason." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993) (emphasis omitted). "Conclusory allegations of discrimination, without more, are not sufficient to raise an inference of pretext . . . ." *Furcron v. Mail Ctrs. Plus, LLC*, 843 F.3d 1295, 1313 (11th Cir. 2016) (quotation omitted)).

Edom makes six arguments in support of a finding of pretext. First, Edom argues that a jury could infer racial discrimination because Edom "did not commit sexual harassment, but rather, [Edom], himself was subjected to sexual harassment by Scantlebury." (Doc. 82 at 14.) Edom is mistaken.

As an initial matter, it would not be evidence of pretext for HCSO to believe Scantlebury's story that Edom initiated the conversation and attempted to pry into her sexual history while speaking graphically about his own. (Doc. 67-8 at 41–42.) That is so

22

even if Scantlebury's story was false. *See Nix v. WLCY Radio/Rahall Commc'ns*, 738 F.2d 1181, 1187 (11th Cir. 1984) ("[An] employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason."). Nor would it be evidence of pretext for HCSO to find that Scantlebury had done nothing wrong. But the transcripts from Wellinger's hearing and the DRB hearing suggest that HCSO did not do that. Instead, they accepted Edom's version of the events: Scantlebury approached Edom, began the conversation, and directed it down a sexually explicit path.

Nevertheless, HCSO determined that Edom committed sexual harassment and conduct unbecoming an officer because he listened to Scantlebury's conversations about her sexual history and did not end the conversation or tell her that it was inappropriate. Instead, he responded by suggesting she was trying to make him fantasize about her and later by calling her "beautiful." Edom admitted these facts at the DRB hearing,[7] (Doc. 83-3 at 10, 12, 14, 19), and in the hearing with Wellinger, (Doc. 67-8 at 16–19). The DRB

---

[7] In the fact section of his response, Edom claims that Chronister said at the hearing that Edom admitted "all the allegations levied against him." (Doc. 82 at 6.) Any argument based on this allegation is abandoned because Edom does not apply it in the argument section of his response. *See LaCourse v. PAE Worldwide Inc.*, 980 F.3d 1350, 1360 (11th Cir. 2020) (explaining that a litigant abandons an argument where "she makes only 'passing references' to it in the background section of her brief" (quotation omitted)). But it also mischaracterizes the transcript. After Edom admits in the hearing to calling Scantlebury "beautiful," (Doc. 83-3 at 10), admits to having conversations with Ford about Edom's wife not having sex with him, (*id.* at 12), and admits that he listened to Ford's and Scantlebury's inappropriate conversations without stopping them, (*id.*), Chronister sums up by saying "you've admitted to having these conversations with her," (*id.*). Given this context, no reasonable juror could review the transcript and conclude that Chronister was saying that Edom admitted "all the allegations levied against him." (Doc. 82 at 6.)

found that enough to sustain the charges, even if Scantlebury began the conversation. (Doc. 83-3 at 13, 15–16, 21.)

The DRB rejected Edom's suggestion that sexual harassment requires that he "ask [her] for sex or anything like that." (*Id.* at 13.) Instead, because Edom was on duty, in uniform, in a position of legal authority in a civilian environment, HCSO determined that Edom's acquiescence to Scantlebury's conversation and his decision to participate by interjecting the comment about her attempting "to make [him] have fantasies about [her]," (*id.* at 14, 21), violated HCSO rules on harassment and conduct unbecoming a sheriff's deputy, (*id.* at 13 ("Your conversation in its very inherent nature [would] be the violation.")).

HCSO also rejected Edom's suggestion that he could not violate the rules unless he initiated the conversation or was primarily at fault. *See Furcron*, 843 F.3d at 1314 (reasoning that an employee's argument "that she violated no work rules" was not a sufficient allegation of pretext). Edom now repackages this argument—and the fact that HCSO rejected it—as an argument that HCSO discriminated against him based on his race. But Edom's "burden is to show not just that [HCSO's] proffered reasons [for recommending termination] were ill-founded but that unlawful discrimination was the true reason." *Alvarez v. Royal Atl. Devs., Inc.*, 610 F.3d 1253, 1267 (11th Cir. 2010). At bottom, Edom is "quarrelling with the wisdom" of HCSO's decision and its definition of

24

sexual harassment. *Chapman v. Al Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000). Edom cannot succeed by such tactics. *See id.*

Second, Edom argues that Portalatin, the IA investigator, relied on false or conflicting statements from Ford and Scantlebury in reaching his conclusion. (Doc. 82 at 15.) This argument fails.

Edom does not identify the statements that he believes are false or conflicting. Nor does he explain why these statements are so obviously incredible that Portalatin could not believe Ford and Scantlebury unless he was motivated by racial animus. But even if Portalatin did rely on false statements, it would not matter. The DRB's independent review of the investigation "cleansed" the decision of any "taint of a biased subordinate employee." *Wood v. Calhoun Cnty.*, 626 F. App'x 954, 956 (11th Cir. 2015). And Edom does not claim that the DRB, which made the decision that termination was appropriate—relied on Ford's or Scantlebury's statements. Nor could he. As explained above, the DRB members accepted the story as Edom told it and focused on the parts of the record that Edom admitted. With those admissions in hand, the DRB concluded that Edom should have terminated the conversation, that he should not have said what he did, and that he failed to take responsibility for his actions.

Third, Edom argues that it is evidence of pretext for racial discrimination that HCSO allowed Wellinger to participate in the investigation while he, a white male, was

having an affair with a subordinate. (Doc. 82 at 14.) If Edom means to suggest that HCSO's differential treatment of Wellinger is grounds for inferring pretext, he is mistaken. Wellinger is not a proper comparator, so the fact that HCSO treated him differently than Edom does not give rise to an inference of racial discrimination. What is more, Edom points to no evidence that HCSO knew of Wellinger's affair at the time of the hearing—or that it was even ongoing at that juncture. Finally, HCSO rules required Wellinger preside over the hearing because he was Edom's division commander. (Doc. 76-1 at 9.)

Fourth, Edom argues that HCSO's decision to allow Chronister and Clark to sit on the DRB is evidence that HCSO was discriminating against him for his race. (Doc. 82 at 15.) Edom reasons that Chronister should have been excluded because he forwarded Scantlebury's complaint to IA;[8] Clark, too, should have been excluded because she filed a position statement with the EEOC in response to Edom's charge of discrimination.

Edom asserts that failure to exclude these individuals shows pretext because Chronister and Clark "had made up their minds prior to the DRB hearing." (Doc. 82 at 15.) Edom points to no evidence for this assertion. But even if he had, Edom does not

---

[8] Edom argues that Chronister violated HCSO policy by forwarding the complaint directly to IA rather than to Edom's supervisor. (Doc. 82 at 15; Doc. 76-1 at 2–3.) HCSO disagrees. But even if Edom is correct, he does not explain how Chronister's failure to observe this sequence shows that HCSO was discriminating against Edom because of his race. And the error appears harmless since Edom's superior was required to refer the investigation to IA. (Doc. 76-1 at 5 (requiring that IA investigate all allegations of sexual harassment).)

explain how it shows pretext that Clark and Chronister—both of whom reviewed the evidence prior to the hearing—decided the likely outcome before the hearing.[9]

Moreover, Edom points to no rule requiring that Clark and Chronister recuse themselves or that HCSO exclude them for their minimal prior involvement in Edom's case. Instead, HCSO rules required that Chronister, as a colonel, and Clark, as chief legal counsel, sit on the DRB. (Doc. 79 at 4; Doc. 76-1 at 16.)

Fifth, Edom argues that similar white employees were treated differently for sexual misconduct, loss of master deputy status, and accidental firearm discharges. (Doc. 82 at 17.) This argument too fails. As explained above, Edom has not established that these individuals were similarly situated. Differential treatment of differently situated employees does not give rise to an inference of discriminatory intent.

But even if some comparators were proper, it would not be sufficient to show pretext. In fact, comparators work *against* Edom's suggestion of racial discrimination. HCSO identifies two white employees who resigned with a "red separation" after sustained allegations of sexual harassment and one black employee who received no discipline after

---

[9] In the fact section of his brief, Edom asserts that Clark "chastised" him for filing an EEOC charge. (Doc. 82 at 6.) Edom abandoned this assertion by failing to apply it in the argument section of his brief. *See LaCourse*, 980 F.3d at 1360. And, as with Chronister's comments at the DRB, Edom mischaracterizes the DRB transcript. After Edom notes at the hearing that he "should've known better" and "shouldn't have let [the conversations with Scantlebury] go on," Clark responds "[b]ut you haven't [taken responsibility] . . . . You've blamed [Major Wellinger,] you've blamed everyone else. You've filed complaints with my office that we're doing this to you based on your race or your age or we're retaliating against you. I have never seen you take responsibility for what occurred or for not being a better deputy sheriff and stopping this." (Doc. 83-3 at 23.) No reasonable jury could find this exchange suggestive of intentional race discrimination.

27

an investigation found the allegations of sexual harassment were unfounded. (Doc. 77 at 1–2; Doc. 66-2 at 4–5.) So too, HCSO issued one-day suspensions to twenty-one deputies who accidentally discharged a firearm between 2010 and 2020. Thirteen of them were white. (Doc. 77-1.) Edom has no response. In sum, HCSO's discipline practices do not give rise to an inference of race discrimination.

Finally, Edom claims that he was subjected to racist joking and racial slurs during his time at HCSO. (Doc. 82 at 12.) Specifically, between 2004 and 2006, Anthony Miller made several racially charged comments toward Edom. (Doc. 67 at 93–103; Doc. 13 ¶ 21.) Edom reported these comments to IA, but Miller was not disciplined. (Doc. 67-17 at 12.) Edom argues HCSO's failure to act is evidence of racial discriminatory intent. (Doc. 82 at 12.) Edom is mistaken. Racist comments from one employee and HCSO's failure to discipline him between 2004 and 2006 do nothing to prove that HCSO disciplined Edom with racially discriminatory intent a decade later.

Likely recognizing that these comments are insufficient, Edom attempts to supplement them with an affidavit filed alongside his response to the motion for summary judgment. (Doc. 83-6 at 2–3.) This attempt to add new facts beyond those alleged in the Complaint is improper. Just as a plaintiff cannot "amend [the] complaint through argument in a brief opposing summary judgment," he may not raise a "new factual basis" or "additional evidence" to support those claims. *Mitchell v. Pilgrim's Pride Corp.*, 817 F.

App'x 701, 708 (11th Cir. 2020) (per curiam) (quoting *Lightfoot v. Henry Cnty. Sch. Dist.*, 771 F.3d 764, 799 (11th Cir. 2014)). But that is precisely what Edom tries to do.

Edom's Complaint and deposition agree that Miller made racist jokes "[b]etween 2004 and 2006." (Doc. 13 ¶¶ 21–24; Doc. 67 at 93–103.) Neither document alludes to further racist comments, slurs, or jokes. It is only in Edom's affidavit, filed with his response to the motion for summary judgment, that Edom amends his story to aver that the racist comments occurred "[t]hroughout" his employment. (Doc. 83-6 at 2.) Because Edom "improperly attempted to offer a new factual basis for his claims," *Mitchell*, 817 F. App'x at 708—an additional decade of racist comments—the Court disregards it.

But even if Edom could rely on racist comments that occurred throughout his employment, Edom does not provide evidence that HCSO was aware of it. In response to interrogatories, Edom lists all his complaints to HCSO. The only one that deals with racist comments involves Miller and was filed in "[a]pproximately 2004." (Doc. 67-17 at 12.) A reasonable jury could not infer that HCSO acted with racially discriminatory intent because some of its employees used racist jokes or slurs when Edom did not raise the matter. *Cf. Scott v. Suncoast Beverage Sales, Ltd.*, 295 F.3d 1223, 1229 (11th Cir. 2002) (reasoning that racist comments "unrelated to a termination decision" are of little probative value in the pretext inquiry).

All told, Edom's allegations—whether considered separately or together—fall short of "significantly probative evidence showing that the asserted reason [for his termination] is merely a pretext for discrimination" based on race. *Clark*, 990 F.2d at 1228. Since Edom cannot rebut HCSO's nonretaliatory reason for disciplining him, his claim fails under *McDonnell Douglas*.

### B. Convincing Mosaic of Circumstances

Even though Edom's claims fail under *McDonnell Douglas*, he may survive summary judgment if he "presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent." *Smith*, 644 F.3d at 1328. A triable issue exists when the record forms "a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination." *Id.* (quotation and footnote omitted). An inference "is not a suspicion or a guess. It is a reasoned, logical decision to conclude that a disputed fact exists on the basis of another fact . . . ." *Id.* at 1328 n.25 (quoting *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 448 (2d Cir. 1999)).

For the same reasons that Edom cannot establish pretext, he cannot establish a mosaic of circumstances that convincingly suggests intentional race discrimination.[10] *See Mitchell*, 817 F. App'x at 710 (holding that an employee "failed to assemble any type of

---

[10] Edom notes that "he is not pigeon holed into a strict format in which to present his case" and cites to *Smith*, the leading case on the convincing mosaic theory. (Doc. 82 at 9.) But Edom does not separately argue the mosaic theory. *See Higgins v. New Balance Athletic Shoe, Inc.*, 194 F.3d 252, 260 (1st Cir. 1999) ("The district court is free to disregard arguments that are not adequately developed . . . .").

mosaic" when his "only evidence of intent" consisted of arguments that failed under the pretext prong of *McDonnell Douglas*). There is no evidence from which a reasonable jury could find that HCSO discriminated against Edom because of his race. Unlike other cases in which courts have found a convincing mosaic, Edom has not "demonstrated a motive to discriminate, incidents of white and black employees being treated differently, [or] the employer's conscious tracking of race in disciplinary decisions." *Moultrie v. Ga. Dep't of Corr.*, 703 F. App'x 900, 907 (11th Cir. 2017). Or shown "suspicious timing, ambiguous statements," pretext, "or other information from which discriminatory intent may be inferred." *Jenkins*, 26 F.4th at 1250–51 (quotation omitted). Nor has Edom "cast sufficient doubt on [HCSO's] proffered reasons" or shown that HCSO "acted arbitrarily." *Holley v. Ga. Dep't of Corr.*, 845 F. App'x 886, 891 (11th Cir. 2021) (per curiam).

Instead, Edom disagrees with HCSO's decision to hold him responsible for not terminating sexually explicit conversations that Scantlebury began, and for encouraging it by suggesting that she was flirting with him. But Edom does not contest the facts HCSO relied on to make that decision. Thus he has not argued that its proffered "reason was false." *Brooks v. Cnty. Comm'n of Jefferson Cnty.*, 446 F.3d 1160, 1163 (11th Cir. 2006) (discussing pretext under *McDonnell Douglas*), or that it was a mere disguise for racial discrimination. He merely counters that Scantlebury—a civilian not employed at HCSO— was more responsible than he was. But Edom may not substitute his "business judgment

31

for that of the employer[],” *Bailey v. Huntsville*, 517 F. App'x 857, 864 (11th Cir. 2013) (per curiam), or use discrimination law to “take away an employer's right to interpret its rules as it chooses,” *Nix*, 738 F.2d at 1187. “The employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason.” *Id.* And Edom fails to provide evidence from which a reasonable jury could find that discrimination was “the real reason” the DRB recommended his termination. *Brooks*, 446 F.3d at 1163 (quotation omitted).

In sum, Edom has not presented “circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent.” *Smith*, 644 F.3d at 1328. Accordingly, HCSO is entitled to summary judgment.

### C. Liability Standard under Section 1983

Edom brings his claims through 42 U.S.C. § 1983, which prohibits officials acting under color of state law from violating a person's rights under federal law. Because the Court concludes that Edom's § 1981 and Fourteenth Amendment claims fail on the merits, the Court does not decide whether Edom could hold HCSO liable under § 1983. *See Hoefling v. City of Miami*, 811 F.3d 1271, 1279 (11th Cir. 2016) (describing municipal liability under § 1983).

IV.    **CONCLUSION**

HCSO is entitled to judgment because Edom does not carry his burden under the

*McDonnell Douglas* framework and fails to present a triable issue of fact on his claims that

HCSO discriminated against him based on race.

Accordingly, the following is **ORDERED:**

1.    Defendant's Motion for Summary Judgment on Counts II and VI is **GRANTED**. (Doc. 66.)

2.    The Clerk is **DIRECTED** to enter judgment in favor of Defendant, to terminate any pending motions or deadlines, and to close this case.

**ORDERED** in Tampa, Florida, on April 29, 2022.

Kathryn Kimball Mizelle
United States District Judge